**David McFARLAND, Parent and Next Friend of Stephen and Daniel McFarland, et al.  Plaintiffs**

v.

**JEFFERSON COUNTY PUBLIC SCHOOLS, et al.**
**Defendants**

**No. CIV.A. 3:02CV–620–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

June 29, 2004.

Teddy B. Gordon, Louisville, KY, for Plaintiff.

Byron E. Leet, Francis J. Mellen, Jr., Pamela J. Ledford, Wyatt, Tarrant & Combs, Louisville, KY, for Defendant.

Chinh Quang Le, New York, NY, for NAACP Legal Defense and Educational Fund, Inc.

David A. Friedman, Amanda G. Main, Amy D. Cubbage, Sheryl G. Snyder, Taylor Spalding Flanery, Frost Brown Todd LLC, Louisville, KY, for American Civil Liberties Union of Kentucky, Inc.

Jeffrey T. Metzmeier, Louisville, KY, for Kentucky Commission on Human Rights.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

For twenty-five years, the Jefferson County Public Schools ("JCPS" or "the Board") maintained an integrated school system under a 1975 federal court decree. After release from that decree four years ago, the JCPS elected to continue its integrated schools through a managed choice plan that includes broad racial guidelines ("the 2001 Plan"). This case arises because some students and their parents say that the Board's student assignment plan violates their rights under the Equal Protection Clause of the United States Constitution.[1]

The occasion of the fiftieth anniversary of *Brown v. Board of Education* [2] has generated much discussion regarding whether that ruling has fulfilled its original promise. To give all students the benefits of an education in a racially integrated school and to maintain community commitment to the entire school system precisely express the Board's own vision of *Brown*'s promise. The benefits the JCPS hopes to achieve go to the heart of its educational mission: (1) a better academic education for all students; (2) better appreciation of our political and cultural heritage for all students; (3) more competitive and attractive public schools; and (4) broader community support for all JCPS schools.

One half a century of social change after *Brown*, the constitutional questions the

---

1. Plaintiffs offer a litany of federal laws under which federal jurisdiction is appropriate and under which they request that the Court find their civil rights have been violated: Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 703(a)(1), the Civil Rights Act of 1991, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, KRS ch. 344, the First and Fourteenth Amendments to the U.S. Constitution, and "appropriate paragraphs" of the Kentucky State Constitution. The arguments presented by both sides have addressed only the constitutionality of the racial guidelines under the Equal Protection Clause.

2. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

federal courts confront are derivative of but dramatically different from those addressed in *Brown*. This case raises one of those questions: to what extent does the Equal Protection Clause limit JCPS's discretion to use race-conscious policies to maintain an integrated public school system. The Supreme Court has yet to consider this question directly.

## I.

## SUMMARY

This case has required the Court to weigh individual rights under the Equal Protection Clause against the responsibility and right of an elected public school board to determine its own educational policies. For guidance, the Court has focused on the divided opinions of the Supreme Court in two recent cases: *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and *Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003). The first of these opinions upheld race-conscious admissions policies at the University of Michigan Law School; the latter struck down different policies at the University of Michigan's College of Literature, Science and the Arts. These two cases set out the requirement that any use of race in a higher education admissions plan must further a compelling governmental interest and must be narrowly tailored to meet that interest. The Court considered these principles in the slightly different context of an elementary and secondary school student assignment plan.

JCPS meets the compelling interest requirement because it has articulated some of the same reasons for integrated public schools that the Supreme Court upheld in *Grutter*. Moreover, the Board has described other compelling interests and benefits of integrated schools, such as improved student education and community support for public schools, that were not relevant in the law school context but are relevant to public elementary and secondary schools.

In most respects, the JCPS student assignment plan also meets the narrow tailoring requirement. Its broad racial guidelines do not constitute a quota. The Board avoids the use of race in predominant and unnecessary ways that unduly harm members of a particular racial group. The Board also uses other race-neutral means, such as geographic boundaries, special programs and student choice, to achieve racial integration.

The student assignment process for the traditional schools is distinct from that employed at all other programs and schools. In that process, JCPS separates students into racial categories in a manner that appears completely unnecessary to accomplish its objectives. To the extent the 2001 Plan incorporates these procedures, the Court concludes that it violates the Equal Protection Clause. The Board may continue to administer the 2001 Plan in every respect in all of its schools, with the exception of its use of racial categories in the traditional school assignment process.

## II.

## FACTUAL BACKGROUND

Plaintiffs all have children who attend or have attended Jefferson County public schools and have participated in the student assignment process. Each, in different ways, is dissatisfied with the procedure or result of his or her child's assignment to a Jefferson County public school.[3] Plain-

---

3. Plaintiff David McFarland has two boys, Stephen and Daniel. In 2002–2003, Stephen applied to Jefferson County Traditional Middle School ("JCTMS") as a rising sixth grader without indicating a second choice option for a magnet or optional program. He was rejected by JCTMS and assigned to Newburg,

tiffs seek to enjoin the use of racial guidelines under the 2001 Plan, including the use of racial categories in the traditional school assignment process. This Court has stated that, because the student assignment plan applies at all grade levels in all school settings in the Jefferson County schools, any ruling would necessarily apply to the entire school system.

The JCPS Board is composed of seven members elected by district for terms of four years. The Board manages and controls JCPS. The Board is a corporate body which is organized and exists pursuant to KRS § 160.160. It has the powers and duties stated in KRS § 160.290 and other applicable statutes. The Board selects a superintendent, who acts as the chief administrative officer of JCPS. Defendant Stephen Daeschner is the Superintendent of JCPS.

This Court conducted a five-day hearing in December 2003. Prior to this hearing, the parties entered into a 135–paragraph stipulation that included 75 exhibits. At the hearing, several Plaintiffs testified

his resides middle school. He then applied for a transfer to Myers Middle School, where he was accepted and enrolled. In 2003–2004, Stephen reapplied to JCTMS and was accepted. He attended JCTMS for the seventh grade.

Daniel McFarland lives in the Price Cluster. His resides elementary school is Bates. In 2002–2003, Daniel applied to two cluster schools, Fern Creek and Luhr, as well as to Schaffner Traditional Elementary without indicating a second choice option for a different magnet or optional program. He was rejected by Schaffner and chose not to accept an offer to go to the traditional program at Maupin; enrollment in the Maupin program would have put Daniel in the traditional school "pipeline." Daniel was then assigned to Fern Creek. He did not apply for a transfer from Fern Creek after the cluster and magnet application process was complete. In 2003–2004, Daniel applied again to Schaffner Traditional without indicating a second choice magnet program and was accepted. He attended Schaffner for the second grade.

Plaintiff Ronald Pittenger's son, Brandon, attended Bates Elementary School for kindergarten through fifth grade. In 2002–2003, as a rising sixth grader, Brandon applied to JCTMS as his first choice and the Newburg Math, Science and Technology Magnet Program as his second choice. He was not accepted at JCTMS, and his application to the Newburg MST Program was not processed because a student can only enroll in the Newburg magnet program if it is listed as the student's first choice. Brandon chose not to attend his resides middle school at Newburg. Brandon later enrolled at Evangel Christian School for the sixth grade and chose to stay there. He did not reapply to JCTMS or any other public school option in 2003–2004.

Plaintiff Anthony Underwood's son, Kenneth Maxwell Aubrey, attended several different schools in Jefferson County and elsewhere from kindergarten through fifth grade. In 2002–2003, he applied as a rising sixth grader to JCTMS without offering a second choice magnet or optional program. His application was rejected by JCTMS, and he was assigned to Newburg. He applied for a transfer to Myers Middle School, which was accepted, and he enrolled in Myers for the sixth grade. In 2003–2004, he did not apply for magnet programs nor a transfer from Myers. He attended Myers in the seventh grade.

Plaintiff Crystal Meredith's son, Joshua McDonald, was unable to be enrolled in his resides school, Breckinridge–Franklin Elementary School, because it was filled to capacity. He was then assigned to Young Elementary School ("Young") for kindergarten in 2002–2003. He applied for a transfer to Bloom Elementary School ("Bloom"), which was not in his assigned cluster of schools, and was denied admittance because his transfer to Bloom would have had an adverse effect on Young's racial composition in violation of the racial guidelines under the student assignment plan. Joshua, however, did not apply for any further transfers after his request for Bloom was denied (students are unlimited in the number of transfer requests they can make), did not appeal the decision to deny the transfer, and did not apply in 2003–2004 for a different cluster school, a magnet program, or another transfer. Joshua attended Young in the first grade.

about their experiences with the JCPS student assignment plan.[4] Defendants called the superintendent, several board members, numerous administrative staff members, principals and educational experts, who provided testimony about all aspects of the JCPS student assignment plan, the traditional program, the student population and the importance of a racially integrated education.[5]

## A.

JCPS is the 28th largest public school system in the United States. Its district boundaries mirror those of the new Metropolitan Louisville which is now the 16th largest city in the nation. In 2003–2004, about 97,000 students were enrolled in JCPS: approximately 5,000 in preschool programs; 42,500 in elementary schools; 21,650 in middle schools; 24,750 in high schools; 2,100 in alternative schools; and about 1,000 in special schools and special

4. Plaintiffs called four witnesses. Plaintiffs David McFarland, Ronald Pittenger, and Crystal Meredith testified about their experiences with the traditional school admissions process and the student assignment plan in general. Plaintiffs also called an additional witness, Cherri Jackson, who testified about her failed attempt to enroll her children at the elementary school that she preferred in her cluster.

5. Defendants called thirteen witnesses (listed in order of appearance): Carol Ann Haddad, a school board member, testified about changes in 1991 and 1996 to the student assignment plan, the origins of the traditional program, and more generally about the importance and benefits of racial integration in education; Dr. Stephen Daeschner, JCPS Superintendent, testified about the student assignment plan and the traditional program, the variables involved in reducing the achievement gap between Blacks and Whites and low and high performing schools, and the benefits of racial integration; Patricia Todd, Executive Director for Student Assignment, testified about the different types of schools and academic programs and the assignment process for the traditional schools and JCPS as a whole; Carolyn Meredith, Director of Employee Relations for JCPS, testified about the hiring and placement of principals and teachers; Loudena Peabody, Director of Instructional Support for JCPS, testified about her previous experience as a teacher and principal in JCPS and methods for improving student performance; Sam Corbett, former school board member and local business owner, testified about the importance of racial integration in education as it prepares students for working in a diverse workplace and the lack of differences between traditional

and non-traditional schools; Dr. Robert Rodosky, Executive Director of Accountability, Research, and Planning, testified about the demographic make-up of and racial segregation in housing in Jefferson County, data about the student assignment process, data about state testing scores, use of income data as a predictor of academic performance, and data about the traditional school admissions process; Dr. Edward Kifer, Jr., Professor in the College of Education at the University of Kentucky, testified about research regarding socioeconomic status as a predictor of academic success, the achievement gap between Blacks and Whites, and the impact of diversity on a public school system; Janice Hardin, Chief Financial Officer and Treasurer for JCPS, testified about school funding, per pupil expenditures, and teacher salaries; Tito Castillo, Principal of Fern Creek Traditional High School, testified about the similarities of his traditional high school to the magnet traditional program; Mark Rose, Principal at Jefferson County Traditional Middle School ("JCTMS"), testified about the differences and similarities between traditional and non-traditional public schools and the admissions process at JCTMS; Rick Caple, Director of Transportation for JCPS, testified about the JCPS transportation system for students and the transportation budget; Joseph Burks, Assistant Superintendent for JCPS High Schools, testified about his previous experience as principal of Louisville Male and his knowledge of Male and Butler as compared with other traditional JCPS high schools; and Dr. Gary Orfield, Professor of Education and Social Policy at Harvard University and Co-Director of the Harvard Civil Rights Project, testified about his research on desegregation and the benefits of diversity in public schools.

education centers. The racial profile of students subject to the 2001 Plan is about 34% Black and 66% White.[6]

JCPS offers a full array of comprehensive, specialized and advanced programs throughout its schools.[7] It operates pre-school and grades Primary 1 ("kindergarten") through grade five in its 87 elementary schools, sixth grade through the eighth grade in its 23 middle schools, and ninth grade through twelfth grade in its 20 high schools. It also operates the Brown School, which contains all grade levels in one building, as well as several alternative schools and special education centers. Each school building has a program capacity, which is the number of students that the building can accommodate, consistent with the programs offered there. JCPS allocates operating funds to each school using the same formula that is uniformly applied to all JCPS schools.

The Kentucky Education Reform Act of 1990 ("KERA") sets out many requirements for curriculum development, educational goals and assessment requirements for all Kentucky schools, including JCPS. KERA requires each school to form a School–Based Decision Making Council ("SBDM council" or "Council") composed of parents, teachers and the school's principal or administrator. Each Council determines which textbooks, instructional materials and student support services will be used at its school. It also adopts policies for various aspects of school life.

KERA requires a statewide assessment program known as the Commonwealth Accountability Testing System ("CATS"). This test measures core academic content, basic skills, and higher-order thinking skills and their application. KERA requires that JCPS and SBDM councils identify achievement gaps between various groups of students, including between Black and White students, and between Free and Reduced Lunch ("FRL") students and non-FRL students. JCPS sets biennial targets for eliminating those achievement gaps.

**B.**

This case and its legal predecessors[8] are inseparable from JCPS's ongoing commitment to racial integration within its individual schools. One can find the complete

---

**6.** The JCPS student assignment plan records the race of each student as Black or African-American and Other, which this Court will denote as "White." This particular practice of distinguishing only Black and non-Black students and referencing non-Black students as "Others" was discussed rather extensively during the hearing. As several witnesses testified, JCPS is a school district almost entirely populated by only Black and White students. Students of other races and backgrounds, such as Latino and Asian students, are represented only in very small numbers, e.g., less than five percent of the total student population is neither non-Hispanic Black nor White. The Court believes that it is more accurate to refer to the two groups as "Black" and "White."

**7.** The Comprehensive Program is the main instructional program. The Advance Program offers a curriculum for gifted and tal-

ented students. The Honors Program provides intensive academic preparation for middle and high school students in the Comprehensive Program. The Exceptional Child Education Program offers services to students with identified disabilities.

**8.** *See Newburg Area Council, Inc. v. Bd. of Educ. of Jefferson County,* 489 F.2d 925 (6th Cir.1973); *Newburg Area Council, Inc. v. Bd. of Educ. of Jefferson County,* 510 F.2d 1358 (6th Cir.1974); *Newburg Area Council, Inc. v. Gordon,* 521 F.2d 578 (6th Cir.1975); *Cunningham v. Grayson,* 541 F.2d 538 (6th Cir. 1976); *Haycraft v. Bd. of Educ. of Jefferson County,* 560 F.2d 755 (6th Cir.1977); *Haycraft v. Bd. of Educ. of Jefferson County,* 585 F.2d 803 (6th Cir.1978); *Hampton v. Jefferson County Bd. of Educ.,* 72 F.Supp.2d 753 (W.D.Ky.1999) (*"Hampton I"*); *Hampton v. Jefferson County Bd. of Educ.,* 102 F.Supp.2d 358 (W.D.Ky.2000) (*"Hampton II"*).

legal and historical background of this case in *Hampton I*, 72 F.Supp.2d 753, 754–67 (W.D.Ky.1999). A brief description follows.

In 1973, parents and students filed two federal lawsuits against the Board and the former Louisville Board of Education, alleging that each maintained a segregated school system and demanding desegregation of those schools (collectively, the "*Haycraft*" case). In December 1973, on appeal from dismissal of both lawsuits, the Sixth Circuit directed Judge James Gordon to devise a student assignment plan that eliminated all vestiges of state-imposed segregation in the two school systems. *Newburg Area Council, Inc. v. Bd. of Educ. of Jefferson County*, 489 F.2d 925, 932 (6th Cir.1973). In July 1975, Judge Gordon approved such a plan, and the then-existing Board implemented it. By December 1981, Judge Gordon ended his direct monitoring of schools. In April 1984, the Board approved the first significant modification of its student assignment plan.

Over the next decade, the Board gradually increased specialized educational offerings and encouraged students to make voluntary school choices. In August 1996, after receiving advice from consultants, various committees and a public opinion survey, the Board again revised its student assignment plan. In April 1998, students and parents filed a lawsuit alleging that the students were denied admission to Central High School due to their race. In June 1999, this Court concluded that Judge Gordon's original *Haycraft* desegregation decree was still in effect. *Hampton I*, 72 F.Supp.2d at 774. Plaintiffs then moved to dissolve that decree.

In June 2000, this Court dissolved the 1975 desegregation decree, ordered JCPS to cease using racial quotas at Central High School, and ordered JCPS to complete any reevaluation and redesign of the admissions procedures in other magnet schools before the beginning of the 2002–2003 school year. *Hampton II*, 102 F.Supp.2d 358, 377–81 (W.D.Ky.2000).[9]

To comply with the Court's order, the Board ended its use of racial quotas at Central High School and at three other magnet schools, duPont Manual High School (including the Youth Performing Arts School ("YPAS")), the Brown School, and Brandeis Elementary. The Board determined that the Court's order did not address the use of race at magnet traditional schools. In April 2001, after considering public feedback from opinion surveys and community meetings, the Board adopted the 2001 Plan.

### III.

### THE 2001 STUDENT ASSIGNMENT PLAN

Notwithstanding many changes and refinements to its assignment plans over the past twenty-five years, the Board's pri-

---

9. Some of the Court's findings in *Hampton II* are relevant to the current case: (1) the Board demonstrated extraordinary good faith through its dedication to quality education in an integrated setting, 102 F.Supp.2d at 369–70; and (2) the Board's student assignment plan was no longer bound by a federal court decree, *id.* at 377. The Court concluded the following: (1) that elected school boards had traditional authority to establish an educational policy, *id.* at 379; (2) that, as between equal schools, the assignment to one particular school did not create a burden or confer a benefit that was constitutionally protected, *id.* at 380; (3) that the Board could use race along with other factors to maintain an integrated school system, *id.* at 379; and (4) that the use of racial quotas to exclude students from magnet schools with special programs violated the Equal Protection Clause, *id.* at 381. The Court did not discuss the status of traditional schools or the assignment process for them.

mary objective has remained constant: to maintain a fully integrated countywide system of schools. The 2001 Plan contains three basic organizing principles: (1) management of broad racial guidelines, (2) creation of school boundaries or "resides" areas and elementary school clusters, and (3) maximization of student choice through magnet schools, magnet traditional schools, magnet and optional programs, open enrollment and transfers. Using these principles, JCPS provides a form of managed choice in student assignment for its students individually and for the system as a whole.

## A.

The racial guidelines broadly influence the overall student assignment plan. This is not surprising since one of the Board's current stated goals under the 2001 Plan is to provide "substantially uniform educational resources to all students" and to teach basic skills and critical thinking skills "in a racially integrated environment." To accomplish these objectives, the 2001 Plan requires each school to seek a Black student enrollment of at least 15% and no more than 50%. This reflects a broad range equally above and below Black student enrollment systemwide.

Prior to any consideration of a student's race, a myriad of other factors, such as place of residence, school capacity, program popularity, random draw and the nature of the student's choices, will have a more significant effect on school assignment. The guidelines mostly influence student assignment in subtle and indirect ways. For instance, where the racial composition of an entire school lies near either end of the racial guidelines, the application of any student for open enrollment, transfer or even to a magnet program could be

affected. In a specific case, a student's race, whether Black or White, could determine whether that student receives his or her first, second, third or fourth choice of school.

For the most part, the guidelines provide administrators with the authority to facilitate, negotiate and collaborate with principals and staff to maintain schools within the 15–50% range. The Court will discuss the actual assignment process in greater detail in Sections III.D and III.E of this Memorandum.

## B.

Geographic boundaries greatly influence student assignments. Each JCPS school, except Central, duPont Manual and YPAS, Male and Butler high schools, the Brown School, Brandeis Elementary, and the traditional programs at Foster and Maupin, has a designated geographic attendance area, which is called its "resides area." Each student is assigned a "resides school" based upon the residence address of his or her parent(s) or guardian. In 2002–2003, 57.5% of all students attended their resides school.[10]

At the elementary school level, all non-magnet elementary schools are grouped into twelve clusters. The elementary schools in a cluster, which includes a student's resides school, are designated as "cluster resides schools" for that student. Racial demographics have influenced the boundaries for contiguous and non-contiguous resides areas and the composition of some elementary school clusters. Elementary schools are clustered so that combined attendance zones, assuming normal voluntary choices, will produce at each school student populations somewhere within the racial guidelines.

---

10. At the elementary school level, 57% of students attended their resides school. At the middle school level, 67.5% attended their resides school. At the high school level, 49.7% attended their resides school.

Each non-magnet middle and high school has its own resides area. There are no clusters at those levels. Apart from age, graduation from previous grade and residence, no selection criteria govern admission of any student to his or her resides school or a school within his or her cluster. The geographic boundaries of resides areas and cluster schools determine most school assignments.

## C.

Student choice may be the most significant element of the 2001 Plan. In addition to a choice of geographic location, JCPS offers students the choice of numerous and varied specialized schools and programs. The basic settings of specialized curriculum are: (1) magnet schools, (2) magnet and optional programs, and (3) magnet career academies. Differences abound, even within these broad groupings. Virtually all age appropriate students may apply for admission to any of these specialized programs.

JCPS has created thirteen magnet schools. Non-traditional magnet schools do not have a resides area. Any student, regardless of address, may apply to the four non-traditional magnet schools: Brandeis Elementary, duPont Manual (including YPAS), Central, and Brown. These schools offer specialized programs and curricula. The remaining nine magnets are traditional schools that offer regular curriculum in a particular school environment. Although students may only apply to a particular traditional school based on place of residence (except for Butler, Male, and the traditional programs at Foster and Maupin), traditional schools are not resides schools for any student because all students must apply for entry.

The Board has created eighteen magnet programs.[11] These are small, specialized programs within a regular school. The Board has also created optional programs in twenty-two schools.[12] These are small, specialized programs with unique characteristics. A student may apply for admission to any magnet or optional program regardless of his or her resides area.[13]

Magnet career academies are high schools that offer programs focusing on a specific technical career. Students must apply to the magnet program at a magnet career academy. The Board has designated thirteen resides high schools, plus Central, as magnet career academies.[14] Except in the case of Central, which has a unique curriculum and is open to students countywide, the majority of students enrolled in a magnet career academy live in that school's resides area.

11. Magnet programs are located at the following schools: at the elementary school level, Byck, Coleridge–Taylor Montessori, Foster, Kennedy Montessori, King, Maupin, Wheatley, and Young; at the middle school level, Farnsley, Highland, Thomas Jefferson, Meyzeek, Newburg, and Noe; and at the high school level, Atherton, Doss, Seneca, and Western. Foster and Maupin elementary schools have traditional magnet programs.

12. Optional programs are located at the following schools: at the elementary school level, Cane Run and Price; at the middle school level, Crosby, Highland, Lassiter, Moore, Southern Leadership Academy, Stuart, and Westport Traditional; and at the high school level, Doss, Eastern, Fern Creek, Iroquois, Jeffersontown, Moore, Pleasure Ridge Park, Seneca, Shawnee, Southern, Valley, Waggener, and Western.

13. Students who apply to the Math, Science and Technology Program at Farnsley, Meyzeek, or Newburg middle schools and are accepted to the program are assigned to one of those schools based upon place of residence.

14. Magnet career academies are located at Atherton, Central, Doss, Fairdale, Fern Creek, Iroquois, Jeffersontown, Moore, Pleasure Ridge Park, Seneca, Shawnee, Southern, Valley, and Waggener.

An important part of student choice is the ability of virtually any student to apply for open enrollment (high school freshmen only) or transfer to any non-magnet school. The process for each is similar. After the initial assignment process is complete, any student may apply for transfer to any non-magnet school.[15] Rising freshmen may apply for open enrollment to any non-magnet high school. If the student is accepted, the receiving school becomes the student's resides school. In each case, the receiving school makes the original decision to accept or reject the applicant. The number of students actually requesting transfer or open enrollment is quite small.[16]

### D.

School geographic boundaries and student choice interact to create a huge array of choices and flexibility within the assignment process.

At the Primary 1 (or kindergarten) level, a student is assigned to his or her resides school unless that school lacks capacity or the student applies for another school. The racial guidelines do not apply to kindergarten.

An elementary school student has as many as five choices. Normally, that student is assigned to his or her resides school unless that school exceeds its capacity or hovers at the extreme ends of the racial guidelines (except for kindergarten), or the student has been accepted to another school or program in or out of the resides cluster.[17] All parents of incoming kindergarten students, first graders or new elementary school students may select a first and second choice school within their resides cluster and a first and second choice magnet or optional program, including a traditional school. Students may list a traditional school only as a first choice magnet program. A student may exercise his or her choices in each successive year.

The principals in each cluster and JCPS administrators jointly determine elementary school assignments based upon student choices, the available space and the racial guidelines. If the student is unhappy with the assignment, the student may request a transfer to another elementary school, in or out of the cluster. Acceptance by an application for his resides school, another cluster school, a magnet school or program, or a transfer to another school the following year.

**15.** A school may approve transfer applications for a variety of reasons, including day care arrangements, medical criteria, family hardship, student adjustment problems, and program offerings. In addition, school capacity, a student's attendance record, behavior, grades and the racial guidelines play a role. Three of Plaintiffs' children applied to transfer out of the schools to which they were assigned. Two were successful; one was not. After Stephen McFarland and Kenneth Aubrey were not accepted to Jefferson County Traditional, they both applied for a transfer to Myers Middle School from their resides school at Newburg, and both were accepted. Joshua McDonald also applied for a transfer to Bloom Elementary School when he could not enroll in his resides school at Breckinridge–Franklin and was assigned to Young. His transfer request was denied under the racial guidelines, but he did not apply for another transfer that year nor did he submit

**16.** Overall, over the past two years, transfer and open enrollment applications together have represented about 7.6% of JCPS students. However, many students apply for both. Therefore, the actual number of students seeking either is probably less than 5%. In 2003–2004, JCPS received 1,208 open enrollment applications and accepted 335, or 27.7%. In 2002–2003, JCPS received a total of 6,185 transfer applications and granted 4,061, or 65.7%.

**17.** A student could apply for and receive acceptance to a magnet or traditional school, a magnet or optional program, or a cluster or other school by transfer.

transfer depends upon the racial guidelines and program capacity. If a student submits no application, then the student is assigned to a school within his or her resides cluster depending upon capacity and the racial guidelines. Only a small number of elementary students receive an assignment that is not one of their choices.[18]

At the middle school level, students have three choices. Most students choose to attend their resides school, for which the only selection criteria are graduation from an elementary school and place of residence. A student may also apply for a first and second choice magnet middle school or magnet or optional program. Regardless of acceptance to a magnet program, a student may choose to attend either his or her resides school or select a third option, which is to apply for a transfer to another middle school.

At the high school level, students have the same basic three choices. Most high school students choose to attend their resides school for which the only selection criteria are middle school graduation and place of residence. Students may also apply for a first and second choice magnet high school or optional or magnet program. Rising freshmen may also apply for open enrollment to any non-magnet high school of their choice. If a student is accepted to a high school through open enrollment, that high school becomes the student's resides school. Regardless of acceptance to a magnet program, a student may choose to attend either his or her resides school or select a third option, which is to apply for a transfer to another high school.

The admissions process for non-traditional magnet schools, magnet programs and optional programs at all grade levels is relatively straightforward. Admissions decisions for the four non-traditional magnet schools [19] are based upon: (1) objective criteria established by the school or program, such as a survey and/or essay, recommendations by adults, a work sample or audition, attendance data, course grades and CATS and/or standardized test scores; (2) available space in the school or program; and (3) for students applying to Brown, position on a computer-generated random draw list and residence within a zip code that will make the student body representative of the entire county. In addition to objective criteria and program capacity, the racial guidelines are a factor in admission to all the other magnet and optional programs. Admission to one of the middle school Math, Science and Technology Programs is also based upon position on a computer-generated random draw list.

### E.

Traditional schools have a more complex admissions process, which combines elements of student choice, program and school capacity, geographic boundaries, pure chance, broad racial guidelines and the use of racial categories to separate applicants. Some Plaintiffs initiated this litigation because they object to JCPS's use of the racial guidelines in general, and the use of racial categories in particular, in the traditional school admissions process.

JCPS first developed traditional programs for the 1976–1977 school year. Traditional schools offer the same comprehen-

---

18. Generally, about 95–96% of all elementary students receive their first or second choice cluster school. In 2003–2004, about 30% of elementary school applicants to magnet or optional programs received their first or second choice.

19. The admissions process for the traditional schools will be explained separately.

sive curriculum offered by every other non-magnet school. These schools emphasize basic skills in a highly structured educational environment, discipline and dress codes, learning with daily follow-up assignments, and concepts of courtesy, patriotism, morality and respect for others. Parents are expected to monitor their children's school work, to support their children's academic and extracurricular activities, and to be involved in the school PTA.

The traditional program is offered as the sole structure at nine schools: four elementary, three middle and two high schools.[20] In addition, JCPS offers the traditional program at two resides elementary schools, Foster and Maupin.[21] In 2002–2003, about 9.3% of all JCPS students were enrolled in the traditional program. Application to the traditional program at Foster and Maupin is open to students districtwide. Students apply to the other traditional schools based on place of residence (except at Butler and Male). The traditional schools, including Foster and Maupin, admit students only by application. They do not accept students based on transfer or high school open enrollment applications. In response to the increasing popularity of the tradi-

tional school setting, eight other resides schools now offer this learning environment to their students.[22]

1.

Place of residence and position on the random draw lists are the primary factors for entry into the traditional program. With the exception of the programs at Foster and Maupin, which are open to students districtwide, each traditional elementary and middle school has its own geographic zone. Students attend the traditional school in their geographic zone. After initial acceptance, the so-called "pipeline" becomes the dominant influence in traditional school assignment. The "pipeline" guarantees each current traditional school student a spot in the next grade level without submitting a new application. The "pipeline" enlarges in each grade, thus creating openings for new applicants to the traditional program.

The traditional program begins in kindergarten. At this grade level, the four traditional elementary schools have a total of 360 openings (96 at each school, except 72 at Schaffner).[23] These students form the first stage of the traditional program "pipeline." The "pipeline" increases by twenty-four students at the first grade lev-

---

20. The traditional schools are as follows: at the elementary school level, Audubon, Carter, Greathouse/Shryock, and Schaffner; at the middle school level, Barret, Jefferson County Traditional, and Johnson; and at the high school level, Butler and Louisville Male.

21. Foster is a traditional program within a resides school. In 2003–2004, about half of its students were in the traditional program. Maupin also has a separate traditional program within its resides school, but all students at Maupin receive traditional instruction. Most importantly, as described later, any student attending the traditional program at these schools is part of the traditional school "pipeline."

22. These resides schools have elected to provide instruction to their students in a tradi-

tional or structured environment, with the same emphasis on traditional discipline and other instructional concepts as the traditional magnet schools. All eight schools have "turned" traditional in the past ten years: Smyrna and Wilkerson elementary schools, Moore and Westport middle schools, and Fern Creek, Moore, Valley, and Waggener high schools. Each school's SBDM council, with Board approval, made the decision and designed the instructional program and environment at these schools. Students attending these eight resides traditional schools do not become part of the traditional school "pipeline" discussed in Section III.E.1.

23. A small number of kindergarten students attend the traditional programs at Foster and Maupin.

el. The "pipeline" increases by sixty-four students at the fourth grade level and by sixteen students at the fifth grade level, due to increases in the pupil to teacher ratio. After the four traditional elementary schools have filled all their available spaces, Foster and Maupin send letters to the parents of student applicants who were not accepted, offering them the opportunity to apply to those traditional magnet programs. Foster and Maupin also accept additional students to their traditional program between the first and fifth grades. Students who attend Foster and Maupin become part of the traditional school "pipeline" and therefore gain the right to attend a traditional middle school.

Middle schools are larger than elementary schools. Consequently, the "pipeline" increases by about 450 students at the sixth grade level and by sixty students at the seventh grade level. About 800 students graduate from the three traditional middle schools. These students can state a preference to attend either Butler or Male. The two traditional high schools have available space for 946 ninth graders, 446 at Butler and 500 at Male. Currently, most middle school students choose Male, so that school usually has no spots available for new applicants. On the other hand, Butler typically has about 200 openings for students outside the traditional school "pipeline." Consequently, students not in the "pipeline" may apply for Butler. Their applications are considered to the extent space is available.

Students who are not accepted to a traditional school have other opportunities to join the "pipeline." For instance, a student may elect to apply to the traditional programs at Foster or Maupin. Plaintiff David McFarland's son, Daniel McFar-

land, chose not to accept his offer to attend Maupin. Students may also reapply each year. Two students in this case, Stephen and Daniel McFarland, applied a second time, and each was accepted to a traditional school. Neither Brandon Pittenger nor Kenneth Aubrey, the other two children challenging the traditional school assignment plan, chose to reapply to a traditional school.

2.

The racial guidelines also apply to the traditional schools. The process for employing the guidelines, however, is significantly different from the process as it is applied to all other schools. Applicants are separated and randomly sorted into four lists at each grade level: Black Male, Black Female, White Male and White Female.

The principal has discretion to draw candidates from different lists in order to stay within the racial guidelines for the entire school student population. The racial guidelines apply to the entire school, not per grade. Generally speaking, depending on how many spaces are available for new applicants,[24] a principal will first take a certain number of applicants from each list—for instance, the first ten names on each list—and notify the parents. If the parent declines to enroll the child in that school, the principal can now move to the next name on one of the four lists, using his or her discretion as to which list to choose from. If all of the parents accept, depending upon space availability, the selection process may be complete or may require selection of a few more students. The Office of Demographics gives final approval on a principal's selections to ensure that the school is within the racial guidelines.

---

24. For instance, Schaffner has 72 slots available at kindergarten, so a principal will be able to take more students at that time. But, as the grades progress, a principal will have fewer and fewer slots available for new applicants because spaces are filled by students already in the "pipeline."

A principal may not deviate from the order in which the names appear on the lists. If a principal has chosen all the names on a given list, he or she is not permitted to recruit additional applicants for that race/gender category. Similarly, if few or no Black students apply to a traditional school, a principal would be limited to admitting only those Black students who apply at that time. JCPS, however, makes a concerted effort through the Parent Assistance Center and the Department of Student Assignment to ensure adequate Black student participation in the traditional program.[25]

## IV.

### THE STANDARD OF REVIEW

■ The Equal Protection Clause of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. While everyone agrees that any government action based on race is subject to thorough judicial inquiry, some dispute the exact nature of that inquiry. This Court concludes that the Supreme Court has unequivocally established that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized." *Gratz v. Bollinger*, 539 U.S. 244, 270, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)) (internal quotation marks omitted); *see also Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).

The Supreme Court first stated this view in *Korematsu v. United States*, where it found all racial classifications to be "immediately suspect" and subject to "the most rigid scrutiny." 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944). In virtually every case since then, in a broad variety of circumstances and despite repeated entreaties to reverse itself, the Supreme Court has applied the same standard. *See, e.g., Grutter*, 539 U.S. at 326, 123 S.Ct. 2325; *Gratz*, 539 U.S. at 270, 123 S.Ct. 2411; *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (invalidating a federal government contract program giving preference to businesses owned by racial minorities); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion) (invalidating municipal program requiring all contractors to subcontract at least 30% of each contract to minority-owned businesses); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (invalidating teacher layoff policy that granted racial preferences in making layoff decisions); *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (outlawing state anti-miscegenation statute); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (outlawing *de jure* racial segregation in the District of Columbia public school system). Most recently, in *Grutter* and *Gratz*, the Supreme Court explicitly reaffirmed strict scrutiny for review of racial classifications in higher education admissions programs.[26]

Several lower courts have suggested that some form of intermediate scrutiny might be more appropriate when examining the constitutionality of certain affirma-

25. In Jefferson County, fewer Black than White students tend to apply to traditional schools so that the lists of Black males and females will be shorter than the lists for White applicants. Black applicants, therefore, generally have a higher chance of acceptance to traditional schools than White applicants because their numbers are smaller.

26. No Justice appears to have suggested that a lesser degree of scrutiny was appropriate in either *Grutter* or *Gratz*.

tive action plans promoting racial integration in housing and among students and teachers in public schools.[27] While the present case is distinguishable in many respects from the Supreme Court's most recent decisions in *Grutter* and *Gratz*, the Supreme Court has always chosen strict scrutiny as the proper standard of review for racial classifications.[28] Given our inherent suspicion of racial categories, the utmost level of scrutiny is required.

This Court will therefore apply strict scrutiny to the JCPS student assignment plan.

## V.

## JCPS HAS ESTABLISHED A COMPELLING INTEREST IN MAINTAINING INTEGRATED SCHOOLS

■ Strict scrutiny means that racial classifications must further a compelling governmental interest and must be narrowly tailored to meet that interest. Absent searching judicial inquiry, one cannot determine "what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate no-

tions of racial inferiority or simple racial politics." *Grutter*, 539 U.S. at 326, 123 S.Ct. 2325 (quoting *J.A. Croson Co.*, 488 U.S. at 493, 109 S.Ct. 706). Strict scrutiny of all racial classifications will " 'smoke out' illegitimate uses of race by assuring that [the government] is pursuing a goal important enough to warrant use of a highly suspect tool." *Id.*

The Supreme Court has said that universities and graduate schools may state a compelling interest in obtaining "the educational benefits of a diverse student body." *Id.* at 328, 123 S.Ct. 2325. The Board's interests articulated here overlap with those of the Michigan Law School at the individual student level. In addition, in its statement of interests, the Board has articulated broader concerns in the different context of public elementary and secondary education.[29] The different context "matters" because, under the Equal Protection Clause, "[n]ot every decision influenced by race is equally objectionable and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decision-

27. *See Raso v. Lago*, 135 F.3d 11, 16–17 (1st Cir.1998); *Jacobson v. Cincinnati Bd. of Educ.*, 961 F.2d 100, 102–03 (6th Cir.1992); *Kromnick v. Sch. Dist. of Phila.*, 739 F.2d 894, 902–03 (3d Cir.1984); *Comfort v. Lynn Sch. Comm.*, 283 F.Supp.2d 328, 364–66 (D.Mass. 2003).

28. Even when the Supreme Court once approved intermediate scrutiny of "benign" racial classifications, it later overruled that decision, applying strict scrutiny to all racial classifications. *See Metro Broad., Inc. v. FCC*, 497 U.S. 547, 564–65, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (applying intermediate scrutiny to "benign" race-based measures), *overruled by Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

29. Justice Thomas has stated that one proposing to use race must "define with precision the interest being asserted." *Grutter*, 539

U.S. at 354, 123 S.Ct. 2325 (Thomas, J., dissenting). No doubt, Justice Thomas articulates a virtually unanimous view of the Court on this point. In view of its importance, this Court has set out the Board's precise statement of its interests at the very beginning of this Memorandum Opinion and repeats it here:

To give all students the benefits of an education in a racially integrated school and to maintain community commitment to the entire school system precisely express the Board's own vision of *Brown* 's promise. The benefits the JCPS hopes to achieve go to the heart of its educational mission: (1) a better academic education for all students; (2) better appreciation of our political and cultural heritage for all students; (3) more competitive and attractive public schools; and (4) broader community support for all JCPS schools. Mem. Op., at 1–2.

maker for the use of race in that particular context." *Id.* at 327, 123 S.Ct. 2325. No particular interest, however, is categorically compelling. The interest asserted must be examined and approved in each case in light of the particular context in which it is asserted.

Whether an asserted interest is truly compelling is revealed only by assessing the objective validity of the goal, its importance to JCPS and the sincerity of JCPS's interest. For the reasons that follow, the Court has no doubt that Defendants have proven that their interest in having integrated schools is compelling by any definition.

### A.

Traditionally, Americans consider the education of their children a matter of intense personal and local concern. Not surprisingly, over many years and in a variety of circumstances, the Supreme Court has strongly endorsed the role and importance of local elected school boards as they craft educational policies for their communities. *Freeman v. Pitts,* 503 U.S. 467, 489–90, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Wash. v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 481–82, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 49–51, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).[30] The historical importance of the deference accorded to local school boards goes to the very heart of our democratic form of government. It is conceptually different—though perhaps more accepted—than the deference discussed in *Grutter* and *Bakke.*[31]

**30.** The Supreme Court has broadly endorsed the importance of local control of public education. This Court agrees with that view. *See Freeman,* 503 U.S. at 490, 112 S.Ct. 1430 ("As we have long observed, 'local autonomy of school districts is a vital national tradition.' Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course.") (citation omitted); *Dowell,* 498 U.S. at 248, 111 S.Ct. 630 ("Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs."); *Seattle Sch. Dist. No. 1,* 458 U.S. at 481, 102 S.Ct. 3187 ("[N]o single tradition in public education is more deeply rooted than local control over the operation of schools....") (quoting *Milliken,* 418 U.S. at 741, 94 S.Ct. 3112); *Brinkman,* 433 U.S. at 410, 97 S.Ct. 2766 ("[O]ur cases have ... firmly recognized that local autonomy of school districts is a vital national tradition."); *Milliken,* 418 U.S. at 741–42, 94 S.Ct. 3112 ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."); *Rodriguez,* 411 U.S. at 49–50, 93 S.Ct. 1278 ("[Local control of schools offers] the opportunity ... for participation in the decisionmaking process that determines how those local tax dollars will be spent.... Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence.").

**31.** Justice Powell first expressed the idea that a university's right to determine its own student body was accorded some special consideration under the First Amendment. *Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 312–14, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In *Grutter,* the Supreme Court reaffirmed the idea that academic freedom grounded in the First Amendment supported some deference to the university. *Grutter,* 539 U.S. at 329,

Democratically elected school boards across the country are struggling to improve our schools and the education of children in them and to retain the public support of their communities. The Court's deference to JCPS's efforts here is neither absolute nor determinative. Rather, offering deference is consistent with the Board's acknowledged responsibilities and complements the basic concepts of democracy. In a different age and under quite different circumstances, the Sixth Circuit observed that

> it is the wiser course to allow for the flexibility, imagination and creativity of local school boards in providing for equal opportunity in education for all students.... [T]here may be a variety of permissible means to the goal of equal opportunity, and that room for reasonable men of good will to solve these complex community problem[s] must be preserved.

*Deal v. Cincinnati Bd. of Educ.*, 11 Ohio Misc. 184, 369 F.2d 55, 61 (6th Cir.1966). The same advice makes sense today in the aftermath of JCPS's long period of court-ordered integration.

Indeed, the Board has earned at least a small measure of the Court's respect as it chooses the method of organizing the community's schools. This Court addressed this very theme in *Hampton II*:

> If JCPS voluntarily chooses to maintain desegregated schools, it acts with the traditional authority invested in a democratically elected school board:

> 'School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion of the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities ....'

102 F.Supp.2d at 379 (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)). Viewing voluntary school integration as an extension of the Supreme Court's school desegregation jurisprudence makes sense. In 1975, an integrated school system and all the benefits it promised were thought so essential that various federal courts required JCPS to create and maintain it. Over the years much has changed. As many school systems escape the mandate of desegregation decrees, they face for the first time a choice of direction. It would seem rather odd that the concepts of equal protection, local control and limited deference are now only one-way streets to a particular educational policy, virtually prohibiting the voluntary continuation of policies once required by law.[32]

123 S.Ct. 2325. In the different context of public school education, that concept of deference is not relevant here.

**32.** Justice Thomas has argued that deference is contradictory to the very idea of strict scrutiny. *Grutter*, 539 U.S. at 362, 123 S.Ct. 2325 (Thomas, J., dissenting). For instance, he said that while a state may opt to create an elite law school, it has no compelling interest to do so. *Id.* at 357–58, 123 S.Ct. 2325. He said that "there is no pressing public necessi-

ty in maintaining a public law school at all." *Id.* at 357, 123 S.Ct. 2325. Public elementary and secondary school education, however, is an entirely different matter. Educating the community's children is not optional. It is essential to all facets of this community's growth and future. JCPS's interests are precisely those which Justice Thomas found absent at the Michigan Law School—educating all students who live in the community. This Court therefore concludes that strict scrutiny and limited deference are compatible here.

While some deference is due JCPS in the exercise of its policy choices, the arguments favoring the Board's compelling interest are so objectively overwhelming that deference is immaterial to the result here.

### B.

Now removed from the mandate of a federal court decree, the Board has made its choice. This Court must consider the importance and validity of that choice.

Integrated schools, better academic performance, appreciation for our diverse heritage and stronger, more competitive public schools are consistent with central values and themes of American culture. Access to equal and integrated schools has been an important national ethic ever since *Brown v. Board of Education* established what Richard Kluger described as "nothing short of a reconsecration of American ideals."[33] What Kluger and others have articulated is that *Brown*'s symbolic, moral and now historic significance may now far exceed its strictly legal importance. Alluding to that very point, this Court has said that "*Brown* and its progeny established a moral imperative to eradicate racial injustice in the public schools." *Hampton II*, 102 F.Supp.2d at 379. Congress recently affirmed the value of racial integration and interaction by its enactment of the No Child Left Behind Act and by the statements contained in that legislation. *See* 20 U.S.C. § 6301 *et seq.*[34] Likewise, the Supreme Court has reiterated that "education ... is the very foundation of good citizenship." *Grutter*, 539 U.S. at 331, 123 S.Ct. 2325 (quoting *Brown*, 347 U.S. at 493, 74 S.Ct. 686).

Neither Congress's statements nor Supreme Court references are proof that a policy of school integration is a compelling goal. They do reinforce, however, the notion that *Brown*'s original moral and constitutional declaration has survived to become a mainstream value of American education and that the Board's interests are entirely consistent with these traditional American values. They reinforce our intuitive sense that education is about a lot more than just the "three-R's."

For the majority in *Grutter*, cross-racial understanding and racial tolerance, preparation for a diverse workplace and training of the nation's future leaders were "substantial" benefits of diversity in higher education. *Id.* at 330–32, 123 S.Ct. 2325. Like institutions of higher education, elementary and secondary schools are "pivotal to 'sustaining our political and cultural

---

**33.** Richard Kluger, *Simple Justice: The History of* Brown v. Board of Education *and Black America's Struggle for Equality* 710 (1975).

**34.** In offering assistance to local educational agencies in setting up magnet schools, Congress specifically noted that

[i]t is in the best interests of the United States ... to continue the Federal Government's support of local educational agencies that are implementing court-ordered desegregation plans and local educational agencies that are voluntarily seeking to foster meaningful interaction among students of different racial and ethnic backgrounds ... [;] to ensure that all students have equitable access to a high quality education that will prepare all students to function well in

... a highly competitive economy comprised of people from many different racial and ethnic backgrounds; and ... to continue to desegregate and diversify schools by supporting magnet schools ....

20 U.S.C. § 7231(a)(4). Congress further noted that the purpose of this particular section of the bill was "to assist in the desegregation of schools ... by providing financial assistance to eligible local educational agencies for ... the elimination, reduction, or prevention of minority group isolation in elementary schools and secondary schools with substantial proportions of minority students" and for "the development and design of innovative educational methods and practices that promote diversity." *Id.* § 7231(b)(1), (3).

heritage' with a fundamental role in maintaining the fabric of society." *Id.* at 331, 123 S.Ct. 2325 (quoting *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). For that reason, these same benefits accrue to students in racially integrated public schools.[35] Several JCPS witnesses testified that, in a racially integrated learning environment, students learn tolerance towards others from different races, develop relationships across racial lines and relinquish racial stereotypes. These values transcend their experiences in public school and carry over to their relationships in college and in the workplace. As a result, these students are better prepared for jobs in a diverse workplace and exhibit greater social and intellectual maturity with their peers in the classroom and at their job. These benefits that the Board seeks from an integrated school system are precisely those articulated and approved of in *Grutter.* The Court finds that the benefits of racial tolerance and understanding are equally as "important and laudable" in public elementary and secondary education as in higher education.[36] *Id.* at 330, 123 S.Ct. 2325.

Other benefits the Board seeks are quite different from those articulated in *Grutter.* Nevertheless, they seem equally compelling. The Board believes that integration has produced educational benefits for students of all races. Over the past twenty-five years, White and Black students in JCPS have progressed by every measure. In *Hampton II,* this Court found that "the Board is convinced that integrated schools provide a better educational setting for all its students; [and] that concentrations of poverty which may arise in neighborhood schools are much more likely to adversely affect black students than whites." 102 F.Supp.2d at 371 n. 30. The evidence presented in this and earlier cases "seems to suggest that African–American student achievement has improved substantially" during the past twenty-five years. *Id.* at 365 n. 12. Indeed, one of Defendants' experts testified that racial integration benefits Black students substantially in terms of academic achievement. The Court cannot be certain to what extent the policy of an integrated school system has contributed to these successes. Opinions surely vary on this issue.[37] The Court certainly need not resolve this ongoing debate. But,

---

**35.** Justice Scalia calls these benefits merely "a lesson of life" as opposed to an "educational benefit." *Grutter,* 539 U.S. at 347, 123 S.Ct. 2325 (dissenting, Scalia, J.). Such lessons are pretty important for most people who are fortunate enough to learn them early in life. These are precisely the lessons that JCPS hopes its students will absorb. JCPS is not attempting to cure "general societal ills" but, rather; to prepare its students for dealing with them. *Id.* at 371, 123 S.Ct. 2325 (dissenting, Thomas, J.).

**36.** Purely as a matter of evidence, JCPS more than carried its burden on this issue. Numerous witnesses testified about the value of these benefits. Plaintiffs offered nothing to the contrary.

**37.** For instance, in *Grutter,* Justice Thomas strenuously objected to the idea that a diverse

student body or integrated school system is necessary for Black students to achieve success. He asserted his own view that "blacks can achieve in every avenue of American life without the meddling of university administrators." *Grutter,* 539 U.S. at 350, 123 S.Ct. 2325 (Thomas, J., dissenting). In an earlier desegregation case, he said:

> Given that desegregation has not produced the predicted leaps forward in black educational achievement, there is no reason to think that black students cannot learn as well when surrounded by members of their own race as when they are in an integrated environment.

*Missouri v. Jenkins,* 515 U.S. 70, 121–22, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring). Justice Thomas's views of educational policy fall among the huge body of conflicting opinions about the benefits of racial integration.

the Fourteenth Amendment does not enact any particular preference of educational policy.[38] As a matter of evidence, however, this Court can find that the Board has valid reasons for believing that its student assignment policies may aid student performance.[39]

The Board also believes that school integration benefits the system as a whole by creating a system of roughly equal components, not one urban system and another suburban system, not one rich and another poor, not one Black and another White. It creates a perception, as well as the potential reality, of one community of roughly equal schools. Student choice and integrated schools, the Board believes, invest parents and students alike with a sense of participation and a positive stake in their schools and the school system as a whole. This is vital to JCPS because, in a very real sense, it competes for students with many types of private and parochial schools throughout Jefferson County. In recent years, it has competed very successfully. One of the ways JCPS meets the competition is by offering quality edu-

cation in an integrated setting at every school.[40] Every measure of student and public attitudes on the value of integration completely supports the conclusion that an integrated school system is an advantage for many parents and students.[41]

The evidence on each of these points demonstrates that maintaining an integrated system may help the Board to achieve its goals for individual students and the system as a whole. The Court concludes, therefore, that the Board's policy of integrated schools is both important and valid.

### C.

The final factor of the compelling interest analysis is whether the Board's motives are sincere and not aimed at some improper or illegitimate purpose, or are merely for the purpose of racial balancing.

In *Hampton II*, this Court considered this very question at some length because the Board's commitment to the ideal of an integrated system went to the very essence of whether dissolving the existing desegregation decree was proper. The

---

**38.** *See Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).

**39.** Once again, Plaintiffs completely failed to introduce evidence that integration is only a neutral factor. All of the testimony of school officials and experts suggested that the fully integrated school system has helped achieve systemwide gains. Plaintiffs introduced no contrary evidence. All that matters is that the Board has valid reasons for believing its policies have succeeded.

**40.** Presumably, Plaintiffs could have challenged the argument that integrated schools are not valuable to the system as a whole. No one, however, made that argument, and not one witness came forward to offer such a view. By contrast, JCPS offered numerous of its own witnesses and two expert witnesses to testify that integrated schools strengthen and make the entire school system more attractive. To find otherwise would require the

Court to ignore every bit of testimony on the subject. As a matter of evidence, the Court's finding is compelled.

**41.** To be sure, the constitutionality of a policy is not determined by its popularity. These numbers merely demonstrate that JCPS's reasons have some validity. In 2000, a confidential survey of high school juniors was conducted for JCPS to record the benefits of a racially integrated school system. Over 90% of the students who received the survey responded. Approximately 92% of White students and 96% of Black students reported that they were "very comfortable" or "comfortable" working with students from different racial and ethnic backgrounds. Over 80% of Black and White students who responded said their school experience helped them learn how to relate to students from other racial groups. And over 90% of respondents in each group reported that they would be comfortable working under a supervisor of a different race as an adult.

Court found that the Board had been truly dedicated to quality education, racial equity and integration over the past twenty-five years. The Board's commitment to the idea of an integrated school system was so strong that it continued even after it was unclear whether Supreme Court precedent or the decree required it. The Board took affirmative steps to build strong public support for its policies of an integrated school system, even when it clashed with the changing educational, social, political and legal perspectives of the 80's and 90's. *Hampton II,* 102 F.Supp.2d at 369–70.

Successive boards and administrations dedicated themselves to integration in a manner thought to be constitutionally acceptable. *Id.* at 370. In the process, the Board treated the idea of an integrated system as much more than a legal obligation. The Board considered it "a positive, desirable policy and an essential element of any well-rounded public school education." *Id.* No one says that the Board somehow intends to discriminate or marginalize either Black or White students. In fact, the Board needs the support of each group to maintain roughly equal schools and a community school system that is attractive to all.

These findings demonstrate conclusively that JCPS is not advancing an interest in racial balancing that the Supreme Court would label as "patently unconstitutional." *Grutter,* 539 U.S. at 330, 123 S.Ct. 2325. "Racial balance is not to be achieved for its own sake." *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430. And, to use race for this purpose fails for want of a compelling reason. In his *Grutter* dissent, Chief Justice Rehnquist said that, absent an adequate explanation of the law school's interest, its attempts to reach a "critical mass" were nothing more than unconstitutional racial

balancing. *Grutter,* 539 U.S. at 378–87, 123 S.Ct. 2325 (Rehnquist, J., dissenting). Justice O'Connor distinguished Michigan Law School's use of race as "defined by reference to the educational benefits that [its compelling reason] is designed to produce." *Id.* at 330, 123 S.Ct. 2325. In our case, the same distinction applies, but with even greater force. The Board has precisely described the academic, social and institutional benefits it achieves from integrated schools. This is a compelling explanation and one that is supported by overwhelming evidence. Based on the evidence, no one can honestly say that JCPS is asserting an interest in racial balancing merely for its own sake.

Considering all the evidence presented in this and other cases, the Court is convinced that the Board's policy of maintaining an integrated school system is sincerely held and not intended to disadvantage any race.[42] Based on the strong evidence of the Board's sincerity and the importance and validity of its goals, the Court concludes that the Board has met its burden of establishing a compelling interest in maintaining racially integrated schools.

## VI.

### THE 2001 PLAN IS NARROWLY TAILORED IN MOST RESPECTS

■ Even to achieve a compelling purpose, the Board may use race only by means that are "specifically and narrowly framed to accomplish that purpose." *Grutter,* 539 U.S. at 333, 123 S.Ct. 2325 (quoting *Shaw v. Hunt,* 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)) (internal quotation marks omitted). To be narrowly tailored, the Board's use of race must " 'fit' this compelling goal so closely

---

42. Plaintiffs did not introduce evidence in either the *Hampton* case or this case that suggested the Board's motives were illegitimate, improper or insincere in any manner.

that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *J.A. Croson Co.*, 488 U.S. at 493, 109 S.Ct. 706. The Court's narrow tailoring inquiry must be carefully "calibrated to fit the distinct issues raised by the use of race" in this case. *Grutter*, 539 U.S. at 334, 123 S.Ct. 2325. Consequently, the Court will evaluate whether the 2001 Plan is narrowly tailored, or is a proper "fit," in light of the factual and analytical differences between this case and the admissions programs reviewed in *Grutter* and *Gratz*.

The complexity of these legal issues and the absence of judicial unanimity mean that fundamental truths about narrow tailoring are difficult to discern. The *Grutter* and *Gratz* opinions reveal a starkly divided court that determines equal protection jurisprudence by a shifting coalition of views in a given context or case. The Court must proceed carefully. For that reason, the Court will not accord even limited deference to the Board's implementation of its goals.[43]

■ With these principles in mind, in order to determine whether the 2001 Plan is narrowly tailored, the Court will evaluate the four primary factors that the Supreme Court considered in *Grutter*: (1) whether the 2001 Plan amounts to a quota that seeks a fixed number of desirable minority students and insulates one group of applicants from another, *id.* at 334–35, 123 S.Ct. 2325; (2) whether the applicant is afforded individualized review, *id.* at

336, 123 S.Ct. 2325; (3) whether the 2001 Plan "unduly harm[s] members of any racial group," *id.* at 341, 123 S.Ct. 2325; and (4) whether JCPS has given "serious, good faith consideration of workable race-neutral alternatives" to achieve its goals, *id.* at 339, 123 S.Ct. 2325.[44] Together, these factors constitute the "fit" that is so important to the narrow tailoring analysis. *Id.* at 333, 123 S.Ct. 2325. The Court's analysis will focus upon elements of the 2001 Plan that govern assignment to non-traditional schools. In a separate section, the Court will consider whether the student assignment process for traditional schools is narrowly tailored.

■ The Court now considers each of these factors in turn.

A.

The most important narrow tailoring issue, and Plaintiffs' primary argument, concerns whether the 2001 Plan operates as a racial quota. "Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Id.* at 335, 123 S.Ct. 2325 (quoting *J.A. Croson Co.*, 488 U.S. at 496, 109 S.Ct. 706). The Supreme Court said that a race-conscious admissions program cannot use a quota system because it would almost always violate the narrow tailoring requirement. *Id.* at 334–35, 123 S.Ct. 2325. As the Supreme Court also wisely noted, however, " '[s]ome attention to numbers,' without more, does not trans-

---

**43.** In his dissent in *Grutter*, Justice Kennedy made this point:

> The [majority] confuses deference to a university's definition of its educational objective with deference to the implementation of this goal. In the context of university admissions the objective of racial diversity can be accepted based on empirical data known to us, but deference is not to be given with respect to the methods by which it is pursued.

539 U.S. at 388, 123 S.Ct. 2325 (Kennedy, J., dissenting). The Court agrees with Justice Kennedy's observation and will recognize that distinction in its narrow tailoring analysis.

**44.** While the Supreme Court often overlapped its discussion of the first and second factors, *see Grutter*, 539 U.S. at 334–39, 123 S.Ct. 2325, for the sake of clarity, this Court separately discusses each of those factors.

form a flexible admissions system into a rigid quota." *Id.* at 336, 123 S.Ct. 2325 (quoting *Bakke*, 438 U.S. at 323, 98 S.Ct. 2733). Common sense and the Supreme Court suggest that any strict or *de facto* racial quota has a couple of known characteristics: it has a precise target, and it insulates some applicants from competition with other applicants. The Court concludes that, for the most part, the 2001 Plan's use of the racial guidelines lacks these attributes.

1.

By definition, a quota must present a relatively precise target.[45] While this would appear clear enough, everyone appears to have different ways of applying this definition to a given set of facts.

The 2001 Plan's racial guidelines for all schools present a quite flexible and broad target range. The Board's goal is to achieve a racial mix of between 15% and 50% Black students at each school. That the actual percentage of Black students at individual schools ranges between 20.1% and 50.4% demonstrates the extent of the Board's flexibility in achieving its goals. Even within this broad range, the Court finds a wide dispersal among the percentages of Black students in JCPS schools. For instance, 62 out of 87 elementary schools, 17 of 23 middle schools, and 15 of 20 high schools have a racial mix of over 40% or under 30% Black students. In other words, only about 30% of all schools show a racial mix within even five percent of either side of the systemwide average. This represents a widely dispersed range

in Black students among JCPS schools rather than a precise target.

Everyone seems to have an opinion about the meaning of statistics. In *Grutter*, for instance, Justices O'Connor and Kennedy battled over statistics and what constituted a quota. Justice O'Connor called the Michigan Law School's percentages of minority students, which varied between 13.5% and 20.1%, "a range inconsistent with a quota." *Grutter*, 539 U.S. at 336, 123 S.Ct. 2325. Justice Kennedy, however, concluded that the percentage of minority law students fell in a much tighter range that he called a quota. He viewed race as almost "an automatic factor" that made the law school's "numerical goals indistinguishable from quotas." *Id.* at 389, 123 S.Ct. 2325 (Kennedy, J., dissenting). He said that "[t]he narrow fluctuation band [among rates of admission for Black applicants] raises an inference that the Law School subverted individual determination, and strict scrutiny requires the Law School to overcome the inference." *Id.* at 390–91, 123 S.Ct. 2325. Justice Kennedy cited Amherst College, which admitted between about 8.5% (81 out of 950 offers) and 13.2% (125 out of 950 offers) minority applicants over a ten-year period, as an example of a range not suggestive of a quota. *Id.* In our case, one finds neither an automatic assignment nor a "narrow band" of percentages of Black students among JCPS schools. Indeed, the range in the percentage of Black students among all JCPS schools is much broader than the range in minority admissions at either Amherst College or Michigan Law School.[46]

---

**45.** A quota is "the share or proportional part of a total that is required" or "the number or percentage of persons of a specified kind permitted to enroll in a college, join a club, immigrate to a country, etc." *Random House Unabridged Dictionary* 1588 (2d ed.1993).

**46.** The range in the Black student population in JCPS is between 20.1% and 50.4%, which is much broader numerically than the range in

minority admissions at Amherst College. However, that is not a fair comparison because the range in JCPS percentages is larger overall. The best comparison is to determine the percentage deviation of each range from its mean. At Amherst, the mean percentage between 13.1% and 8.5% is 10.8%. The range extends 2.3% on either side, or about 21.2% on either side of the mean. The JCPS mean between 50.4% and 20.1% is 35.2%. The

This wide fluctuation suggests a lesser use of race and the absence of a specific target. Finally, even a cursory review of assignment data reveals that neither Black students nor White students are guaranteed assignment to a particular school. Too many race-neutral factors affect assignment for that to be true.

### 2.

A quota also insulates "each category of applicants with certain desired qualifications from competition with all other applicants." *Id.* at 334, 123 S.Ct. 2325 (quoting *Bakke,* 438 U.S. at 315, 98 S.Ct. 2733 (Powell, J.)). In other words, it "put[s] members of those groups on separate admissions tracks." *Id.* (citing *Bakke,* 438 U.S. at 315–16, 98 S.Ct. 2733 (Powell, J.)). Except for traditional school assignment, all JCPS students are subject to the same criteria within the 2001 Plan. Criteria such as residence, student choice and random lottery are significant assignment factors for every student. No JCPS student is insulated from competition with all other students, and no student is placed on a separate admissions track.

■ It is constitutionally permissible to set racial goals to achieve truly compelling interests. It is impermissible, however, to seek that racial goal so assiduously and precisely that it amounts to a quota. JCPS's conduct resembles the former because it has set "a permissible goal ... requir[ing] only a good-faith effort ... to come within a range demarcated by the goal itself." *Id.* at 335, 123 S.Ct. 2325 (quoting *Sheet Metal Workers Int'l Ass'n v. EEOC,* 478 U.S. 421, 495, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)). The broad range in the guidelines shows that the Board does not operate a *de facto* quota that imposes or arrives at a "fixed number or percentage which must be attained." *Id.* (quoting *Sheet Metal Workers Int'l Ass'n,* 478 U.S. at 495, 106 S.Ct. 3019). Thus, the evidence simply does not support the conclusion that the broad racial guidelines actually mask a tighter range, create a *de facto* quota or insulate one group of applicants from competition with another group.

### B.

In *Grutter,* Justice O'Connor noted that the law school's "highly individualized" review of applications meant that the admissions process did not contain "mechanical" or "predetermined diversity bonuses." *Id.* at 337, 123 S.Ct. 2325. For her, the law school's approach was more nuanced than that of the undergraduate admissions program because the law school conducted a meaningful review of the individual candidate's application. In fact, in her *Gratz* concurrence joined by Justice Breyer, she noted the absence of individualized attention when finding the undergraduate program's use of race in its admissions policy impermissible. *Gratz,* 539 U.S. at 276–77, 123 S.Ct. 2411 (O'Connor, J., concurring). The switch that Justices O'Connor and Breyer made between *Grutter* and *Gratz* reveals a potential fault line in the narrow tailoring analysis: the presence or absence of individualized review. Consequently, the Court must determine whether the 2001 Plan incorporates some sufficient form of individualized attention in the assignment process. The Court concludes that it does.

"[H]ighly individualized, holistic review" of each applicant ensures that "each applicant is evaluated as an individual and not in a way that makes an applicant's race or

---

range extends 15.1% either side, or about 43% of either side of the mean. Therefore, the Amherst College range in minority admissions that Justice Kennedy viewed as not constituting a quota is, by comparison, much narrower than the range in the Black student population in JCPS schools.

ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337, 123 S.Ct. 2325. All relevant factors for assignment must be placed "on the same footing for consideration" even though one factor may be accorded more weight in the end. *Id.* (quoting *Bakke*, 438 U.S. at 317, 98 S.Ct. 2733) (internal quotation marks omitted). Likewise, the process must ensure that "all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions." *Id.* Under those circumstances, race is "one of many factors" to consider and may be used as a permissible "tipping" factor in deciding a particular student's placement. *Id.* at 339, 123 S.Ct. 2325 (citing *Bakke*, 438 U.S. at 316, 98 S.Ct. 2733).

One must analyze the 2001 Plan in its totally different context. Unlike the law school, JCPS does not deny anyone the benefits of an education. Unlike the law school, JCPS does not have the goal of creating elite and highly selective school communities. Unlike the law school's admissions process, the JCPS assignment process does not involve weighing comparative criteria in a competitive manner. Rather than excluding applicants, the Board's goal is to create more equal school communities for educating all students. But, like the law school, the JCPS assignment process focuses a great deal of attention upon the individual characteristics of a student's application, such as place of residence and student choice of school or program. It is individualized attention of a different kind in a different context than the Supreme Court found in *Grutter*.

In significant ways, the 2001 Plan actually operates like the "plus" system of which the Supreme Court has spoken so approvingly. *Id.* at 335, 123 S.Ct. 2325 (citing *Johnson v. Transp. Agency*, 480 U.S. 616, 638, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987)). Many factors determine stu-

dent assignment, including address, student choice, lottery placement, and, at the margins, the racial guidelines. But, race is simply one possible factor among many, acting only occasionally as a permissible "tipping" factor in most of the JCPS assignment process. The Supreme Court has said this narrow use of race is permissible given a compelling reason. Specifically, Justice Powell stated in *Bakke* that "[w]hen the [Harvard] Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor...." 438 U.S. 265, 316, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (quoting from amicus brief regarding aspects of Harvard admissions policy). In *Grutter*, the Supreme Court echoed these sentiments, stating that situations where race makes a difference in admissions could happen in "any plan that uses race as one of many factors," including the Michigan Law School plan. 539 U.S. at 339, 123 S.Ct. 2325.

In light of the foregoing analysis, the Court concludes that the 2001 Plan allows for the consideration of several factors, including race. Moreover, except as to traditional schools, the appropriate consideration of individual factors within the assignment context ensures that race does not become "the defining feature" of a student's application.

### C.

Another factor in the narrow tailoring analysis is that the Board's use of race does not "unduly harm members of any racial group." *Grutter*, 539 U.S. at 341, 123 S.Ct. 2325. This is neither a new nor surprising concept. Some twenty-six years ago, Justice Powell referenced the same distinction between denial of admission to a selective graduate school and the assignment of a student to an alternative

but appropriate public school. *Bakke,* 438 U.S. at 300 n. 39, 98 S.Ct. 2733.[47] His observation seems applicable here.

■ Justice Powell's observation is consistent with the now well established concept that a student has no constitutional right to attend a particular school. *Johnson v. Bd. of Educ. of Chi.,* 604 F.2d 504, 515 (7th Cir.1979); *Hall v. St. Helena Parish Sch. Bd.,* 417 F.2d 801, 810 n. 15 (5th Cir.1969); *see Milliken,* 418 U.S. at 746–47, 94 S.Ct. 3112; *United States v. S. Bend Cmty. Sch. Corp.,* 692 F.2d 623, 627 (7th Cir.1982) (citing *United States v. Perry County Bd. of Educ.,* 567 F.2d 277, 279 (5th Cir.1978)). As this Court explained in *Hampton II,* the consequences of assigning students to various public schools are quite different from denying an applicant admission to a selective college or job placement:

> The workplace, marketplace, and higher education cases are poor models for most elementary and secondary public school education precisely because they always involve vertical choices—one person is hired, promoted, receives a valuable contract, or gains admission. Ordinarily, when JCPS assigns students to a particular elementary, middle, or high school, the assignment has no qualitative

or 'vertical' effects. This is so because the Court concludes that as between two regular elementary schools, assignment to one or another imposes no burden and confers no benefit. The same education is offered at each school, so assignment to one or another is basically fungible. As a logical consequence, most courts have concluded that there is no individual right to attend a specific school in a district or to attend a neighborhood school. As among basically equal schools, the use of race would not be a 'preference.' As among basically equal schools, therefore, JCPS's policy is not one of 'affirmative action.'

102 F.Supp.2d at 380 (citations and footnotes omitted). The difference between the use of race in graduate school admissions and the JCPS student assignment plan results from the vastly different concept of each system. The law school admissions program excludes many applicants because of its goal of creating an elite community. The JCPS policy of creating communities of equal and integrated schools for everyone excludes no one from those communities. Consequently, when the Board makes a student assignment among its equal and integrated schools, it neither denies anyone a benefit nor imposes a wrongful burden.[48]

---

47. Justice Powell contrasted the situation of the applicant in *Bakke* rejected by his preferred medical school against that of a public school student sent away from his neighborhood school: "[The applicant's] position is wholly dissimilar to that of a pupil bused from his neighborhood school to a comparable school in another neighborhood in compliance with a desegregation decree. [The medical school] did not arrange for [Allan Bakke] to attend a different medical school in order to desegregate Davis Medical School; instead, it denied him admission and may have deprived him altogether of a medical education." *Bakke,* 438 U.S. at 300 n. 39, 98 S.Ct. 2733.

48. Likewise, Plaintiff Crystal Meredith's son, Joshua McDonald, was not unduly harmed

when JCPS denied his transfer from Young to Bloom under the racial guidelines. He was not denied any benefit because he was denied a transfer between equal and integrated schools. Furthermore, race was only a "tipping" factor in denying Joshua's transfer request. JCPS took into account his address and school preference when he applied to attend his resides school at Breckinridge–Franklin, a request which was denied because the school was full. Next, Joshua had stated no additional preferences for other schools in his cluster, so he was then assigned to Young (he applied right before the school year began and had already missed the deadline for magnet and optional programs). Once he was assigned, he applied to transfer to Bloom, a school outside of his cluster. Here, the racial

The Court concludes that the 2001 Plan uses race in a manner calculated not to harm any particular person because of his or her race. Certainly, no student is directly denied a benefit because of race so that another of a different race can receive that benefit. Rather, the Board uses race in a limited way to achieve benefits for all students through its integrated schools.

### D.

Finally, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives that will achieve" the Board's goals. *Grutter*, 539 U.S. at 339, 123 S.Ct. 2325. It is apparent that, with the notable exception of the traditional schools, the Board not only considered, but actually implemented, a variety of race-neutral strategies to achieve its goals.

Many aspects of the 2001 Plan have avoided using race at all. About 18,000 students, almost 20% of the system, are not covered by the racial guidelines because they attend special schools, programs or kindergarten. Voluntary student choices for numerous academic concentrations and school settings create a certain degree of integration within different schools and the system as a whole. School geographic boundaries accomplish much the same. These two factors account for a vast proportion of all student assignments.

■ "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Id.* For instance, the Board could accomplish its objective through some form of an assignment lottery covering the entire school system.

Such a system, however, would require a "dramatic sacrifice" in student choice, geographic convenience and program specialization. *Id.* at 340, 123 S.Ct. 2325. Moreover, it could only be achieved at a huge financial cost. This is not required.

In every area of school assignment except the traditional schools, the Board has undertaken considerable effort to achieve its goals without the overt use of race in student assignments. It encourages students of all races to exercise choices. It recruits Black and White students for academic programs that promote educational improvement and enhance school integration. As a consequence, the Board's goal of an integrated school system is achieved primarily through alternative measures that are educationally laudable and restrained in the use of race. The Court concludes that, throughout most of the assignment process, the Board sufficiently considered and used alternatives, which either were race-neutral or made minimal use of race, to meet narrow tailoring requirements.

### E.

In summary, except for the traditional school assignment process, which will be discussed separately, the 2001 Plan is a proper "fit" because it is sufficiently flexible to determine school assignments for all students by a host of factors, such as residence, student choice, capacity, school and program popularity, pure chance and race. *Id.* at 337, 123 S.Ct. 2325. Data showing that the majority of students attend their resides schools and that only a

---

guidelines factored into his assignment. They did so, however, only with respect to his third choice and after JCPS had already considered other factors in denying his application to Breckinridge–Franklin. There was no evidence that Joshua's transfer request from Young would have been consistently denied under the racial guidelines had he applied for

further transfers to different schools that same year. And, there was no evidence that Joshua's transfer request would have been denied had he applied the following year for his resides school at Breckinridge–Franklin, another cluster school, a magnet or optional program or a transfer.

very small percentage of students are not assigned to one of the schools they preferred suggest the minimal impact of race on this process. Even for those students assigned to a school they did not select, race is not necessarily "a defining feature" in those assignments. Students may also be enrolled in a particular school because, for instance, (a) they did not make any choices at all or stated only a preference for one particular magnet program that did not accept them, or (b) their preferred or resides school or program was already filled to capacity. Even where race does "tip" the balance in some cases, it does so only at the end of the process, *after* residence, choice and all the other factors have played their part.

The 2001 Plan also "fits" its intended objectives because it does not unduly harm other students. The Plan works so that most students attend a school of their choice. Because all schools have similar funding, offer similar academic programs and comprise more similar ranges of students than possible in neighborhood schools, an assignment to one school over another does not cause constitutional harm to any student.

Except as to traditional schools, the Court cannot see that JCPS has any other workable race-neutral alternatives for accomplishing its compelling objective.

## VII.

### THE TRADITIONAL SCHOOL ASSIGNMENT PROCESS IS NOT NARROWLY TAILORED

■ The sole exception to the Court's narrow tailoring inquiry concerns the traditional school assignment process. Traditional school enrollment amounts to a small portion of the overall student cen-

sus.[49] The assignment process for those schools has features that make it distinct from other aspects of the 2001 Plan and present particularly difficult constitutional questions. In the end, the Court finds that the use of race in the traditional school assignment process is not narrowly tailored.

In some respects, the traditional schools are no different than others throughout JCPS. Traditional schools have the same curriculum, financial resources and student discipline regulations as nearly every other school. They offer a distinct atmosphere for the same educational curriculum available at most other schools. The broad racial guidelines cover traditional schools in the same manner as every other school. Were the traditional school assignment process to function under the same broad racial guidelines and operational principles as previously discussed, it would be entirely permissible.

The traditional school assignment process, however, differs in two respects that have constitutional significance: (1) the assignment process puts Black and White applicants on separate assignment tracks, and (2) its use of the separate lists appears to be completely unnecessary to accomplish the Board's goal.

The significance of separating traditional school applicants into explicit racial categories is that students are placed on separate assignment tracks where race becomes "the defining feature of his or her application." *Grutter*, 539 U.S. at 334, 337, 123 S.Ct. 2325. Elsewhere in the 2001 Plan, the racial guidelines play a muted role in the assignment process along with other factors, such as residence, program capacity and, sometimes, placement in a lottery. True, an individual student's selection to a

---

**49.** In 2002–2003, about 9.3% of all JCPS students were enrolled in the traditional program.

traditional school depends in some measure upon the luck of the random draw. It is, however, a random draw within each separate racial category. The assignment process insulates one group of applicants from the randomness of choice and "competition" with other applicants. The use of categories, therefore, makes race the "defining feature" rather than merely the "tipping" factor.[50] In this Court's view, the Supreme Court would likely find these racial categories highly suspect.

An even more troublesome aspect of these racial classifications is that they appear entirely unnecessary to achieve the Board's stated goal of racial integration. The Court has compared data regarding the racial make-up of the applicant pools in the last two academic years with the racial make-up of the student populations in individual traditional schools at the same time. Overall, the percentage of Black applicants each year to a particular traditional school rather closely approximated the percentage of Black students in that school's population.[51] Under the general law of probabilities, if applicants were selected off of one random draw list, the ratio of Black to White students in the applicant pool at a particular school would be reflected in the ratio of Black to White students in the pool of admitted students and, consequently, in the school's student population at large. More importantly, given the current numbers of Black students applying to traditional schools, the laws of probability predict that each school would fall within the racial guidelines. This is true even at

50. That race becomes more significant in the traditional school assignment process is, overall, borne out by admission statistics. Black applicants generally have a higher chance of acceptance to traditional schools than White applicants because they apply in smaller numbers.

51. For instance, in 2002–2003, 34% of the applicants to Carter were Black, and Blacks made up 35.4% of the students there. At Schaffner, 28% of the applicants were Black, and Black students were 32.2% of the population. At Barret, 24% of the applicants were Black, and Black students were 27.9% of the population. At Jefferson County Traditional, 23% of the applicants were Black, and Blacks made up 26.4% of the student population. In 2003–2004, 33% of the applicants to Carter were Black, and Blacks made up 33.1% of the students. At Schaffner, 30% of the applicants were Black, and Black students were 32% of the population. At Barret, 30% of the applicants were Black, and Black students were 29.5% of the population. At Jefferson County Traditional, 32% of the applicants were Black, and Blacks made up 29.2% of the student population.

In both years, Johnson was the only school where the percentage of Black applicants was noticeably larger than the percentage of Black students at the school. In 2002–2003, 34% of the applicants were Black, and Blacks made up 28.6% of the students. In 2003–2004, 39% of the applicants were Black, and Blacks made up 28.5% of the students. By contrast, in both years, Audubon and Greathouse/Shryock were the only schools where the percentage of Black applicants was visibly lower. In 2002–2003, 23% of the applicants to Audubon were Black, and Black students were 33.2% of the population—a ten-point difference. At Greathouse, 17% of the applicants were Black, and 24.1% of the students were Black—a seven-point difference. In 2003–2004, 22% of the applicants to Audubon were Black, and 32.9% of the students were Black—nearly an eleven-point difference. At Greathouse, 17% of the applicants were Black, and 22.3% of the students were Black—a five-point difference. In 2002–2003, Blacks likewise applied to Butler in numbers (12%) noticeably lower than their representation in the school population (20.8%). But, Butler rebounded in 2003–2004 when 19% of the applicants were Black, and 20.1% of the students were Black.

In *all* cases, however, the percentage of Black applicants fell within the racial guidelines (with the one exception of Butler in 2002–2003). Louisville Male was excepted from these statistics because it typically only has enough space for those students already in the "pipeline" and thus rarely accepts new applicants.

Greathouse Elementary and Johnson Middle where numbers of Black applicants hover at either end of the guidelines. This evidence suggests that the use of racial categories is completely unnecessary.

JCPS says that separate racial lists are necessary to maintain solid levels of Black student participation in traditional schools. JCPS fears that, without the lists, Black students would be admitted in fewer numbers, racial isolation would result, and Black students would be discouraged from applying in the future. Even if this speculation should prove true, the Board has much less intrusive and more precisely targeted means at its disposal to maintain present levels of Black student participation in the traditional program or to rectify decreased future participation at certain schools. JCPS can enhance its recruitment efforts for White and Black students at various traditional schools. It can redraw traditional school boundaries (at least at the elementary and middle school levels) to increase the chances of attracting more Black students from neighborhoods in which Blacks reside and increase outreach to Black families. As the 2001 Plan provides, the Board could then use race as a "tipping" factor if necessary to achieve its compelling goals.

The Court must conclude that the initial separation of traditional school applicants into racial categories makes race a defining feature of the student's application and is entirely unnecessary to accomplish the Board's stated objective of racial integration. This use of race in the 2001 Plan therefore is not narrowly tailored. By revising the 2001 Plan in a manner consistent with this Memorandum Opinion, the Board may maintain its current assignment process. Although the Court has found that the use of racial categories under the 2001 Plan violates Plaintiffs' rights under the Equal Protection. Clause, their children are not entitled to admission

to the school of their choice. First, Plaintiff McFarland's children, Stephen and Daniel, are already enrolled in a traditional school, mooting their particular request for injunctive relief. Second, Plaintiffs Pittenger and Underwood have offered no proof that their children, Brandon Pittenger and Kenneth Aubrey, respectively, were denied entry into a traditional school solely because of their race. Finally, neither has reapplied for the traditional program in a subsequent year. While the Court will enjoin the use of the racial categories in the traditional school assignment process, equity does not require that Plaintiffs' children be admitted to the school of their choice in the upcoming school year. Like all JCPS students, Plaintiffs Pittenger and Underwood may reapply for admission to a traditional school for the 2005–2006 academic year.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has issued a Memorandum Opinion setting forth its views on the issues raised in this case. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' request for relief is granted only to the extent that JCPS shall revise the student assignment process for traditional magnet schools in a manner consistent with the accompanying Memorandum Opinion in time for its use in the 2005–2006 school year assignments.

IT IS FURTHER ORDERED that, as to all other aspects of the JCPS student assignment plan, Plaintiffs' requests for relief are DENIED.

This is a final and appealable order.