Justice Kennedy,
concurring in part and concurring in the judgment.
The Nation’s schools strive to teach that our strength comes from people of different races, creeds, and cultures uniting in commitment to the freedom of all. In these cases two school districts in different parts of the country seek to teach that principle by having classrooms that reflect the racial makeup of the surrounding community; That the school districts consider these plans to be necessary should remind us our highest aspirations are yet unfulfilled. But the solutions mandated by these school districts must themselves be lawful. To make race matter now so that it might not matter later may entrench the very prejudices we seek to overcome. In my view the state-mandated racial classifications at issue, official labels proclaiming the race of all persons in a broad class of citizens — elementary school students in one case, high school students in another — are unconstitutional as the cases now come to us.
I agree with The Chief Justice that we have jurisdiction to decide the cases before us and join Parts I and II of the Court’s opinion. I also join Parts III-A and I1I-C for reasons provided below. My views do not allow me to join the balance of the opinion by The Chief Justice, which seems to me to be inconsistent in both its approach and its implications with the history, meaning, and reach of the Equal Pro *783 tection Clause. Justice Breyer’s dissenting opinion, on the other hand, rests on what in my respectful submission is a misuse and mistaken interpretation of our precedents. This leads it to advance propositions that, in my view, are both erroneous and in fundamental conflict with basic equal protection principles. As a consequence, this separate opinion is necessary to set forth my conclusions in the two cases before the Court.
I
The opinion of the Court and Justice Breyer’s dissenting opinion (hereinafter dissent) describe in detail the history of integration efforts in Louisville and Seattle. These plans classify individuals by race and allocate benefits and burdens on that basis; and as a result, they are to be subjected to strict scrutiny. See Johnson v. California, 543 U. S. 499, 505-506 (2005); ante, at 720. The dissent finds that the school districts have identified a compelling interest in increasing diversity, including for the purpose of avoiding racial isolation. See post, at 838-845. The plurality, by contrast, does not acknowledge that the school districts have identified a compelling interest here. See ante, at 725-733. For this reason, among others, I do not join Parts III-B and IV. Diversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue.
It is well established that when a governmental policy is subjected to strict scrutiny, “the government has the burden of proving that racial classifications ‘are narrowly tailored measures that further compelling governmental interests.’” Johnson, supra, at 505 (quoting Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 227 (1995)). “Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are ‘benign’ or ‘remedial’ and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.” Richmond v. J. A. Croson Co., 488 U. S. 469, 493 (1989) (plurality opinion). And the inquiry *784 into less restrictive alternatives demanded by the narrow tailoring analysis requires in many cases a thorough understanding of how a plan works. The government bears the burden of justifying its use of individual racial classifications. As part of that burden it must establish, in detail, how decisions based on an individual student’s race are made in a challenged governmental program. The Jefferson County Board of Education fails to meet this threshold mandate.
Petitioner Crystal Meredith challenges the district’s decision to deny her son Joshua McDonald a requested transfer for his kindergarten enrollment. The district concedes it denied his request “under the guidelines,” which is to say, on the basis of Joshua’s race. Brief for Respondents in No. 05-915, p. 10; see also App. in No. 05-915, p. 97. Yet the district also maintains that the guidelines do not apply to “kindergartens,” Brief for Respondents in No. 05-915, at 4, and it fails to explain the discrepancy. Resort to the record, including the parties’ stipulation of facts, further confuses the matter. See App. in No. 05-915, at 43 (“Transfer applications can be denied because of lack of available space or, for students in grades other than Primary 1 (kindergarten), the racial guidelines in the District’s current student assignment plan”); id., at 29 (“The student assignment plan does not apply to ... students in Primary 1”); see also Stipulation of Facts in No. 3:02-CV-00620-JGH; Doc. 32, Exh. 44, p. 6 (2003-04 Jefferson County Public Schools Elementary Student Assignment Application, Section B) (“Assignment is made to a school for Primary 1 (Kindergarten) through Grade Five as long as racial guidelines are maintained. If the Primary 1 (Kindergarten) placement does not enhance racial balance, a new application must be completed for Primary 2 (Grade One)”).
The discrepancy identified is not some simple and straightforward error that touches only upon the peripheries of the district’s use of individual racial classifications. To the contrary, Jefferson County in its briefing has explained how and *785 when it employs these classifications only in terms so broad and imprecise that they cannot withstand strict scrutiny. See, e. g., Brief for Respondents in No. 05-915, at 4-10. While it acknowledges that racial classifications are used to make certain assignment decisions, it fails to make clear, for example, who makes the decisions; what if any oversight is employed; the precise circumstances in which an assignment decision will or will not be made on the basis of race; or how it is determined which of two similarly situated children will be subjected to a given race-based decision. See ibid.; see also App. in No. 05-915, at 38, 42 (indicating that decisions are “based on ... the racial guidelines” without further explanation); id., at 81 (setting forth the blanket mandate that “[s]chools shall work cooperatively with each other and with central office to ensure that enrollment at all schools [in question] is within the racial guidelines annually and to encourage that the enrollment at all schools progresses toward the midpoint of the guidelines”); id., at 43, 76-77, 81-83; McFarland v. Jefferson Cty. Public Schools, 330 F. Supp. 2d 834, 837-845, 855-862 (WD Ky. 2004).
When litigation, as here, involves a “complex, comprehensive plan that contains multiple strategies for achieving racially integrated schools,” Brief for Respondents in No. 05-915, at 4, these ambiguities become all the more problematic in light of the contradictions and confusions that result. Compare, e. g., App. in No. 05-915, at 37 (“Each [Jefferson County] school . . . has a designated geographic attendance area, which is called the ‘resides area’ of the school[, and each] such school is the ‘resides school’ for those students whose parent’s or guardian’s residence address is within the school’s geographic attendance area”); id., at 82 (“All elementary students ... shall be assigned to the school which serves the area in which they reside”); and Brief for Respondents in No. 05-915-, at 5 (“There are no selection criteria for admission to [an elementary school student’s] resides school, except attainment of the appropriate age and completion of *786 the previous grade”), with App. in No. 05-915, at 38 (“Decisions to assign students to schools within each cluster are based on available space within the [elementary] schools and the racial guidelines in the District’s current student assignment plan”); id., at 82 (acknowledging that a student may not be assigned to his or her resides school if it “has reached ... the extremes of the racial guidelines”).
One can attempt to identify a construction of Jefferson County’s student assignment plan that, at least as a logical matter, complies with these competing propositions; but this does not remedy the underlying problem. Jefferson County fails to make clear to this Court — even in the limited respects implicated by Joshua’s initial assignment and transfer denial — whether in fact it relies on racial classifications in a manner narrowly tailored to the interest in question, rather than in the far-reaching, inconsistent, and ad hoc manner that a less forgiving reading of the record would suggest. When a court subjects governmental action to strict scrutiny, it cannot construe ambiguities in favor of the State.
As for the Seattle case, the school district has gone further in describing the methods and criteria used to determine assignment decisions on the basis of individual racial classifications. See, e. g., Brief for Respondents in No. 05-908, pp. 5-11. The district, nevertheless, has failed to make an adequate showing in at least one respect. It has failed to explain why, in a district composed of a diversity of races, with fewer than half of the students classified as “white,” it has employed the crude racial categories of “white” and “non-white” as the basis for its assignment decisions. See, e. g., id., at 1-11.
The district has identified its purposes as follows: “(1) to promote the educational benefits of diverse school enrollments; (2) to reduce the potentially harmful effects of racial isolation by allowing student's the opportunity to opt out of racially isolated schools; and (3) to make sure that racially segregated housing patterns did not prevent non-white *787 students from having equitable access to the most popular over-subscribed schools.” Id., at 19. Yet the school district does not explain how, in the context of its diverse student population, a blunt distinction between “white” and “non-white” furthers these goals. As the Court explains, “a school with 50 percent Asian-American students and 50 percent white students but no African-American, Native-American, or Latino students would qualify as balanced, while a school with 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white students would not.” Ante, at 724; see also Brief for United States as Amicus Curiae in No. 05-908, pp. 13-14. Far from being narrowly tailored to its purposes, this system threatens to defeat its own ends, and the school district has provided no convincing explanation for its design. Other problems are evident in Seattle’s system, but there is no need to address them now. As the district fails to account for the classification system it has chosen, despite what appears to be its ill fit, Seattle has not shown its plan to be narrowly tailored to achieve its own ends; and thus it fails to pass strict scrutiny.
II
Our Nation from the inception has sought to preserve and expand the promise of liberty and equality on which it was founded. Today we enjoy a society that is remarkable in its openness and opportunity. Yet our tradition is to go beyond present achievements, however significant, and to recognize and confront the flaws and injustices that remain. This is especially true when we seek assurance that opportunity is not denied on account of race. The enduring hope is that race should not matter; the reality is that too often it does.
This is by way of preface to my respectful submission that parts of the opinion by The Chief Justice imply an all-too-unyielding insistence that race cannot be a factor in instances when, in my view, it may be taken into account. The plurality opinion is too dismissive of the legitimate interest gov *788 ernment has in ensuring all people have equal opportunity regardless of their race. The plurality’s postulate that “[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race,” ante, at 748, is not sufficient to decide these eases. Fifty years of experience since Brown v. Board of Education, 347 U. S. 483 (1954), should teach us that the problem before us defies so easy a solution. School districts can seek to reach Brown’s objective of equal educational opportunity. The plurality opinion is at least open to the interpretation that the Constitution requires school districts to ignore the problem of defacto resegregation in schooling. I cannot endorse that conclusion. To the extent the plurality opinion suggests the Constitution mandates that state and local school authorities must accept the status quo of racial isolation in schools, it is, in my view, profoundly mistaken.
The statement by Justice Harlan that “[o]ur Constitution is color-blind” was most certainly justified in the context of his dissent in Plessy v. Ferguson, 163 U. S. 537, 559 (1896). The Court’s decision in that case was a grievous error it took far too long to overrule. Plessy, of course, concerned official classification by race applicable to all persons who sought to use railway carriages. And, as an aspiration, Justice Harlan’s axiom must command our assent. In the real world, it is regrettable to say, it cannot be a universal constitutional principle.
In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. Cf. Grutter v. Bollinger, 539 U. S. 306 (2003); id., at 387-388 (Kennedy, J., dissenting). If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a *789 general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.
School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. See Bush v. Vera, 517 U. S. 952, 958 (1996) (plurality opinion) (“Strict scrutiny does not apply merely because redistrieting is performed with consciousness of race. . . . Electoral district lines are ‘facially race neutral,’ so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of ‘classifications based explicitly on race’” (quoting Adarand, 515 U. S., at 213)). Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decision-maker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual racial classifications is quite a different matter; and the legal analysis changes accordingly.
Each respondent has asserted that its assignment of individual students by race is permissible because there is no other way to avoid racial isolation in the school districts. Yet, as explained, each has failed to provide the support necessary for that proposition. Cf. Croson, 488 U. S., at 501 *790 (“The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis”). And individual racial classifications employed in this manner may be considered legitimate only if they are a last resort to achieve a compelling interest. See id., at 519 (Kennedy, J., concurring in part and concurring in judgment).
In the cases before us it is noteworthy that the number of students whose assignment depends on express racial classifications is limited. I join Part III-C of the Court’s opinion because I agree that in the context of these plans, the small number of assignments affected suggests that the schools could have achieved their stated ends through different means. These include the facially race-neutral means set forth above or, if necessary, a more nuanced, individual evaluation of school needs and student characteristics that might include race as a component. The latter approach would be informed by Grutter, though of course the criteria relevant to student placement would differ based on the age of the students, the needs of the parents, and the role of the schools.
Ill
The dissent rests on the assumptions that these sweeping race-based classifications of persons are permitted by existing precedents; that its confident endorsement of race categories for each child in a large segment of the community presents no danger to individual freedom in other, prospective realms of governmental regulation; and that the racial classifications used here cause no hurt or anger of the type the Constitution prevents. Each of these premises is, in my respectful view, incorrect.
A
The dissent’s reliance on this Court’s precedents to justify the explicit, sweeping, classwide racial classifications at issue *791 here is a misreading of our authorities that, it appears to me, tends to undermine well-accepted principles needed to guard our freedom. And in his critique of that analysis, I am in many respects in agreement with The Chief Justice. The conclusions he has set forth in Part III-A of the Court’s opinion are correct, in my view, because the compelling interests implicated in the cases before us are distinct from the interests the Court has recognized in remedying the effects of past intentional discrimination and in increasing diversity in higher education. See ante, at 720-723. As the Court notes, we recognized the compelling nature of the interest in remedying past intentional discrimination in Freeman v. Pitts, 503 U. S. 467, 494 (1992), and of the interest in diversity in higher education in Grutter. At the same time, these compelling interests, in my view, do help inform the present inquiry. And to the extent the plurality opinion can be interpreted to foreclose consideration of these interests, I disagree with that reasoning.
As to the dissent, the general conclusions upon which it relies have no principled limit and would result in the broad acceptance of governmental racial classifications in areas far afield from schooling. The dissent’s permissive strict scrutiny (which bears more than a passing resemblance to rational-basis review) could invite widespread governmental deployment of racial classifications. There is every reason to think that, if the dissent’s rationale were accepted, Congress, assuming an otherwise proper exercise of its spending authority or commerce power, could mandate either the Seattle or the Jefferson County plans nationwide. There seems to be no principled rule, moreover, to limit the dissent’s rationale to the context of public schools. The dissent emphasizes local control, see post, at 848-849, the unique history of school desegregation, see post, at 804, and the fact that these plans make less use of race than prior plans, see post, at 857-858, but these factors seem more rhetorical than integral to the analytical structure of the opinion.
*792 This brings us to the dissent’s reliance on the Court’s opinions in Gratz v. Bollinger, 539 U. S. 244 (2003), and Grutter, 539 U. S. 306. If today’s dissent said it was adhering to the views expressed in the separate opinions in Gratz and Grutter, see Gratz, 539 U. S., at 281 (Breyer, J., concurring in judgment); id., at 282 (Stevens, J., dissenting); id., at 291 (Souter, J., dissenting); id., at 298 (Ginsburg, J., dissenting); Grutter, supra, at 344 (Ginsburg, J., concurring), that would be understandable, and likely within the tradition — to be invoked, in my view, in rare instances — that permits us to maintain our own positions in the face of stare decisis when fundamental points of doctrine are at stake. See, e. g., Federal Maritime Comm’n v. South Carolina Ports Authority, 535 U. S. 743, 770 (2002) (Stevens, J., dissenting). To say, however, that we must ratify the racial classifications here at issue based on the majority opinions in Gratz and Grutter is, with all respect, simply baffling.
Gratz involved a system where race was not the entire classification. The procedures in Gratz placed much less reliance on race than do the plans at issue here. The issue in Gratz arose, moreover, in the context of college admissions where students had other choices and precedent supported the proposition that First Amendment interests give universities particular latitude in defining diversity. See Regents of Univ. of Cal. v. Bakke, 438 U. S. 265, 312-314 (1978) (opinion of Powell, J.). Even so the race factor was found to be invalid. Gratz, supra, at 251. If Gratz is to be the measure, the racial classification systems here are a fortiori invalid. If the dissent were to say that college cases are simply not applicable to public school systems in kindergarten through high school, this would seem to me wrong, but at least an arguable distinction. Under no fair reading, though, can the majority opinion in Gratz be cited as authority to sustain the racial classifications under consideration here.
*793 The same must be said for the controlling opinion in Grutter. There the Court sustained a system that, it found, was flexible enough to take into account “all pertinent elements of diversity,” 539 U. S., at 341 (internal quotation marks omitted), and considered race as only one factor among many, id., at 340. Seattle’s plan, by contrast, relies upon a mechanical formula that has denied hundreds of students their preferred schools on the basis of three rigid criteria: placement ■ of siblings, distance from schools, and race. If those students were considered for a whole range of their talents and school needs with race as just one consideration, Grutter would have some application. That, though, is not the case. The only support today’s dissent can draw from Grutter must be found in its various separate opinions, not in the opinion filed for the Court.
B
To uphold these programs the Court is asked to brush aside two concepts of central importance for determining the validity of laws and decrees designed to alleviate the hurt and adverse consequences resulting from race discrimination. The first is the difference between de jure and defacto segregation; the second, the presumptive invalidity of a State’s use of racial classifications to differentiate its treatment of individuals.
In the immediate aftermath of Brown the Court addressed other instances where laws and practices enforced de jure segregation. See, e. g., Loving v. Virginia, 388 U. S. 1 (1967) (marriage); New Orleans City Park Improvement Assn. v. Detiege, 358 U. S. 54 (1958) (per curiam) (public parks); Gayle v. Browder, 352 U. S. 903 (1956) (per curiam) (buses); Holmes v. Atlanta, 350 U. S. 879 (1955) (per curiam) (golf courses); Mayor and City Council of Baltimore v. Dawson, 350 U. S. 877 (1955) (per curiam) (beaches). But with reference to schools, the effect of the legal wrong proved most difficult to correct. To remedy the wrong, school districts that had been segregated by law had no choice, whether *794 under court supervision or pursuant to voluntary desegregation efforts, but to resort to extraordinary measures including individual student and teacher assignment to schools based on race. See, e. g., Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U. S. 1, 8-10 (1971); see also Croson, 488 U. S., at 519 (Kennedy, J., concurring in part and concurring in judgment) (noting that racial classifications “may be the only adequate remedy after a judicial determination that a State or its instrumentality has violated the Equal Protection Clause”). So it was, as the dissent observes, see post, at 814-815, that Louisville classified children by race in its school assignment and busing plan in the 1970’s.
Our cases recognized a fundamental difference between those school districts that had engaged in de jure segregation and those whose segregation was the result of other factors. School districts that had engaged in de jure segregation had an affirmative constitutional duty to desegregate; those that were defacto segregated did not. Compare Green v. School Bd. of New Kent Cty., 391 U. S. 430, 437-438 (1968), with Milliken v. Bradley, 418 U. S. 717, 745 (1974). The distinctions between de jure and de facto segregation extended to the remedies available to governmental units in addition to the courts. For example, in Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 274 (1986), the plurality noted: “This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination.” The Court’s decision in Croson, supra, reinforced the difference between the remedies available to redress de facto and de jure discrimination:
“To accept [a] claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for ‘remedial relief’ for every disadvantaged group. The dream *795 of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs.” Id., at 505-506.
From the standpoint of the victim, it is true, an injury stemming from racial prejudice can hurt as much when the demeaning treatment based on race identity stems from bias masked deep within the social order as when it is imposed by law. The distinction between government and private action, furthermore, can be amorphous both as a historical matter and as a matter of present-day finding of fact. Laws arise from a culture and vice versa. Neither can assign to the other all responsibility for persisting injustices.
Yet, like so many other legal categories that can overlap in some instances, the constitutional distinction between de jure and de facto segregation has been thought to be an important one. It must be conceded its primary function in school cases was to delimit the powers of the Judiciary in the fashioning of remedies. See, e. g., Milliken, supra, at 746. The distinction ought not to be altogether disregarded, however, when we come to that most sensitive of all racial issues, an attempt by the government to treat whole classes of persons differently based on the government’s systematic classification of each individual by race. There, too, the distinction serves as a limit on the exercise of a power that reaches to the very verge of constitutional authority. Reduction of an individual to an assigned racial identity for differential treatment is among the most pernicious actions our government can undertake. The allocation of governmental burdens and benefits, contentious under any circumstances, is even more divisive when allocations are made on the basis of individual racial classifications. See, e.g., Bakke, 438 U. S. 265; Adarand, 515 U. S. 200.
Notwithstanding these concerns, allocation of benefits and burdens through individual racial classifications was found *796 sometimes permissible in the context of remedies for de jure wrong. Where there has been de jure segregation, there is a cognizable legal wrong, and the courts and legislatures have broad power to remedy it. The remedy, though, was limited in time and limited to the wrong. The Court has allowed school districts to remedy their prior de jure segregation by classifying individual students based on their race. See North Carolina Bd. of Ed. v. Swann, 402 U. S. 43, 45-46 (1971). The limitation of this power to instances where there has been de jure segregation serves to confine the nature, extent, and duration of governmental reliance on individual racial classifications.
The cases here were argued upon the assumption, and come to us on. the premise, that the discrimination in question did not result from de jure actions. And when defacto discrimination is at issue our tradition has been that the remedial rules are different. The State must seek alternatives to the classification and differential treatment of individuals by race, at least absent some extraordinary showing not present here.
C
The dissent refers to an opinion filed by Judge Kozinski in one of the cases now before us, and that opinion relied upon an opinion filed by Chief Judge Boudin in a case presenting an issue similar to the one here. See post, at 836 (citing 426 F. 3d 1162, 1193-1196 (CA9 2005) (concurring opinion), in turn citing Comfort v. Lynn School Comm., 418 F. 3d 1, 27, 29 (CA1 2005) (Boudin, C. J., concurring)). Though this may oversimplify the matter a bit, one of the main concerns underlying those opinions was this: If it is legitimate for school authorities to work to avoid racial isolation in their schools, must they do so only by indirection and general policies? Does the Constitution mandate this inefficient result? Why may the authorities not recognize the problem in candid fashion and solve it altogether through resort to direct assignments based on student racial classifications? So, the argu *797 ment proceeds, if race is the problem, then perhaps race is the solution.
The argument ignores the dangers presented by individual classifications, dangers that are not as pressing when the same ends are achieved by more indirect means. When the government classifies an individual by race, it must first define what it means to be of a race. Who exactly is white and who is nonwhite? To be forced to live under a state-mandated racial label is inconsistent with the dignity of individuals in our society. And it is a label that an individual is powerless to change. Governmental classifications that command people to march in different directions based on racial typologies can cause a new divisiveness. The practice can lead to corrosive discourse, where race serves not as an element of our diverse heritage but instead as a bargaining chip in the political process. On the other hand race-conscious measures that do not rely on differential treatment based on individual classifications present these problems to a lesser degree.
The idea that if race is the problem, race is the instrument with which to solve it cannot be accepted as an analytical leap forward. And if this is a frustrating duality of the Equal Protection Clause it simply reflects the duality of our history and our attempts to promote freedom in a world that sometimes seems set against it. Under our Constitution the individual, child or adult, can find his own identity, can define her own persona, without state intervention that classifies on the basis of his race or the color of her skin.
* * *
This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children. A compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue. Likewise, a district may consider it a *798 compelling interest to achieve a diverse student population. Race may be one component of that diversity, but other demographic factors, plus special talents and needs, should also be considered. What the government is not permitted to do, absent a showing of necessity not made here, is to classify every student on the basis of race and to assign each of them to schools based on that classification. Crude measures of this sort threaten to reduce children to racial chits valued and traded according to one school’s supply and another’s demand.
That statement, to be sure, invites this response: A sense of stigma may already become the fate of those separated out by circumstances beyond their immediate control. But to this the replication must be: Even so, measures other than differential treatment based on racial typing of individuals first must be exhausted.
The decision today should not prevent school districts from continuing the important work of bringing together students of different racial, ethnic, and economic backgrounds. Due to a variety of factors — some influenced by government, some not — neighborhoods in our communities do not reflect the diversity of our Nation as a whole. Those entrusted with directing our public schools can bring to bear the creativity of experts, parents, administrators, and other concerned citizens to find a way to achieve the compelling interests they face without resorting to widespread governmental allocation of benefits ¿nd burdens on the basis of racial classifications.
With this explanation I concur in the judgment of the. Court.